**KOAL INDUSTRIES CORPORATION, et al.**

v.

**ASLAND, S.A., Joaquin Bertran, Miguel del Campo, Alberto Vinolas and Joaquin Targhetta.**

No. 89 Civ. 6033 (RJW).

United States District Court, S.D. New York.

Dec. 29, 1992.

Philip R. Hoffman, James A. Janowitz, Deirdre O. Byrne, Myriamne Coffeen, Leonard A. Wohl, Paige Moore, Pryor, Cashman, Sherman & Flynn, New York City, for plaintiffs.

Lawrence W. Newman, Grant Hanessian, Manuel A.J. Teehankee, Karen F. Kyle, Baker & McKenzie, New York City, for defendants.

## OPINION

ROBERT J. WARD, District Judge.

Defendants Asland, S.A. ("Asland"), Joaquin Bertran, Miguel del Campo, Alberto Vinolas and Joaquin Targhetta have moved to dismiss plaintiffs' Amended Complaint, pursuant to Rule 12(b), Fed.R.Civ.P., and/or, in the alternative, for summary judgment pursuant to Rule 56, Fed.R.Civ.P. For the reasons that follow, defendants' motion is granted in part and denied in part.

## BACKGROUND

At the heart of this litigation is the Sugarloaf Mine, which is located in Arkansas and operated by the Sugarloaf Mining Corporation ("SMC"). In 1982, plaintiff Southern States Corporation ("SSC") acquired SMC, financing the acquisition, in part, through loans from Banco Portugues Do Atlantico ("BPA").

By late spring of 1985, SSC and SMC were in financial trouble and defaulted on their loans from BPA, resulting in judgments in excess of $5 million in favor of BPA against SSC and SMC. Plaintiffs allege that it was around this time that defendant Bertran, who was chairman of Asland during the entire period relevant to this case, was experiencing serious personal financial difficulties and initiated a fraudulent scheme, designed to funnel funds to himself so that he could pay off his personal debts. Amended Complaint ¶ 27. Asland already had a relationship with SMC as it had been buying coal from SMC and Koal Industrial Corporation ("KIC"), SMC's mining contractor, since October 1984.

Plaintiffs allege that Bertran met with representatives of SSC, SMC and BPA in Dallas, Texas on June 6, 1985 and falsely represented Asland's interest in the Sugarloaf Mine, its enormous need for coal, and its long-term plans in the United States in order to induce SSC, SMC and BPA to enter into transactions with Asland which would personally benefit Bertran. Amended Complaint ¶¶ 28, 29. To this end, Asland's earlier contract with SMC was replaced in August 1985 by a new five-year agreement between Asland and KIC, wherein Asland agreed to purchase 300,000 metric tons of coal annually from KIC. Amended Complaint ¶ 30.

Plaintiffs allege that Bertran, whose personal financial situation had reached a "desperate" stage by December 1985, caused Asland to replace the August 1985 contract with a new and more substantial contract. This contract ("the December 1985 Coal Contract") committed Asland to purchase 300,000 metric tons of coal annually for seven years or the life of the mine, whichever was longer. The contract also provided that its object was to establish a long-term relationship between Asland and KIC whereby Asland would purchase the total production of the Sugarloaf Mine. The purpose of the new contract, it is alleged, was to underscore Asland's commitment to the Sugarloaf Mine and thereby convince BPA, SSC, SMC, KIC, Earl H. Powers (the sole shareholder and president of KIC) and others to enter into transactions from which Bertran would personally

benefit. Amended Complaint ¶¶ 31, 32 and 34.

Also during December 1985, meetings took place in the United States between Bertran, del Campo and Vinolas, officers of Asland, and Joaquin de Navasques, a principal shareholder of SSC. Bertran, del Campo and Vinolas proposed to de Navasques that Asland, SMC and KIC become partners in three new corporations: Koal Industries International, Inc. ("KII"), European Energy Corporation ("EEC") and Daylight Holdings, Inc. ("DLH") (collectively "the Coal Group"), to be formed for the purpose of mining and marketing Sugarloaf Mine coal and owning the reserves of the mine. Bertran also recommended that control of the Sugarloaf Mine be vested in the Coal Group as SSC and SMC were financially unsuitable to serve as operating companies. Plaintiffs allege that Asland falsely represented that formation of the Coal Group would help SMC and SSC in repaying their loans from BPA and also would generate funds for the Coal Group to acquire equipment and to increase production. Plaintiffs allege that the underlying, principal object of these transactions was to obtain money for Bertran's personal use and to protect Asland with respect to the December 1985 Coal Contract by providing Asland with control over the operations of the mine through Asland's ownership and control of the Coal Group. Further, plaintiffs allege that Asland, through its position of control, could sabotage the production of coal when the price of coal under the December 1985 Coal Contract was unfavorable and benefit when the price of coal from the mine was favorable. Amended Complaint ¶¶ 34–37.

Plaintiffs allege that Bertran directed de Navasques to organize two new companies, Obanos Minerals, N.V. ("Obanos") and Logostable, N.V. ("Logostable"), to join Asland and KIC as owners of the Coal Group, and that de Navasques would own Obanos, and Bertran, through a fiduciary, would own Logostable. Bertran, plaintiffs claim, planned to induce plaintiff Powers or Walter Hediger, president of plaintiff Tele Concert Promotions, Inc. ("TCP"), to invest in Obanos and Logostable and to misappropriate those proceeds for his personal use. Amended Complaint ¶ 38.

Throughout December 1985 and January 1986 numerous negotiations and meetings took place in New York relating to Bertran's proposals. At those meetings, plaintiffs allege that Bertran, Vinolas and del Campo (for Asland) falsely represented to de Navasques (for SSC and SMC) and Powers (for KIC) that:

(a) Powers would be in charge of mining operations and would be chief executive officer of EEC with full authority to enforce a new coal supply agreement which was anticipated to be entered into between Asland and EEC;

(b) Asland possessed the technical skills and expertise to solve the Sugarloaf Mine's problems and make it highly profitable;

(c) Asland would perform in good faith all of its obligations under the anticipated coal supply agreement and would ensure that the Coal Group did the same;

(d) KIC would earn $4.00–$4.75 per ton on coal produced and sold to Asland under the proposed coal supply agreement.

Amended Complaint ¶ 39.

On December 30, 1985, Bertran met with BPA in New York and, according to plaintiffs, represented to BPA that the Coal Group, through purchases of new coal leases, would increase the value of the reserves that SMC had pledged to BPA. He also allegedly falsely represented that Asland viewed this project as the beginning of an investment program in the United States. Asland's senior management also had discussions with BPA in early January 1986, wherein Asland (1) reiterated its commitment to purchase all of the Sugarloaf Mine's coal; (2) stated that this commitment would be a sufficient guarantee of the timely payment of all the BPA loans; and (3) indicated that the Coal Group would be profitable. At the same time, Asland, through telephone conversations and exchange of telexes, sought and obtained BPA's agreement that Asland employees would at all times hold 50% of the seats on the board of directors of each company in

the Coal Group. The Coal Group was formed in February 1986. Each company in the group was capitalized at $1,000 and was owned 40% by Asland, 25% by KIC, 25% by Obanos and 10% by Logostable. In addition, Asland had the option to purchase Logostable's 10% interest for $1 million and thus increase its holding to 50%. Amended Complaint ¶ 47.

It was on the strength of Asland's commitment to the Sugarloaf Mine, reflected by the December 1985 Coal Contract with KIC and its newly acquired interest in the Coal Group, that BPA decided to lend millions of dollars to the Coal Group. Amended Complaint ¶¶ 40–45.

Plaintiffs further allege that at the same time Asland spoke of its long-term commitment to the Sugarloaf Mine, it was purchasing coal and other fuel for its cement business at cheaper prices from other sources and thus had no intention of complying with the proposed coal supply agreement with EEC. Amended Complaint ¶ 46.

KIC was induced by defendants, plaintiffs allege, to surrender its rights under the December 1985 Coal Contract and to operate the Sugarloaf Mine in return for a 25% ownership interest in the Coal Group and Asland's assurances that Powers (of KIC) would manage the mine and direct its sales and marketing operations under the proposed coal supply agreement between Asland and EEC. Amended Complaint ¶ 48.

On February 12 and March 14, 1986, SSC, SMC, the Coal Group, Obanos, Logostable, Powers, de Navasques, BPA and Asland entered into a series of interconnected transactions (collectively "the March 1986 Agreements") through which the existing BPA loans were restructured and new BPA loans were made. These transactions, all negotiated in New York, included:

(a) a new five-year coal supply agreement between EEC and Asland, dated February 12, 1986 and amended as of March 14, 1986 (the "Coal Supply Agreement"), whereby Asland agreed to pur-

chase 300,000 metric tons of coal per year from EEC at prices which would cover the operating expenses of the mine and enable the Coal Group to timely repay all obligations to BPA. Bertran and Asland represented to all that the Coal Supply Agreement was superior and paramount to all other guarantees executed by any party to the transactions then being entered into;

(b) a Security and Loan Agreement, dated February 12, 1986, wherein BPA agreed to: (i) lend KII and DLH $4.3 million and $1.6 million respectively for the payment of SSC's and SCM's existing obligations and the purchase and repair of equipment; and (ii) enter into a Revolving Credit Agreement with EEC for loans up to $1.9 million for working capital for the Sugarloaf Mine;

(c) Guarantees given to BPA regarding the above loan facilities: (i) Guarantees by SMC, KII, DLH and EEC of each other's obligations and the obligations of any other obligor under any other provision of the Security and Loan Agreement; (ii) Guarantees by Powers and de Navasques, not to exceed $2 million each, for the obligations of each member of the Coal Group and SMC under the Security and Loan Agreement; (iii) a Revolving Credit Guarantee by Asland, Obanos, Logostable and KIC whereby each guaranteed a percentage of EEC's obligations under the Revolving Credit Agreement and the $1.9 Promissory Note equivalent to the percentage held by each of them in the Coal Group;

(d) agreements by which SSC would transfer: (i) 66% of SMC's stock to DLH after certain conditions were met;[1] (ii) SMC's mining and processing equipment, having value in excess of $3 million, to KII, in return for KII's assumption of over $5 million in judgment debts owed by SMC and SSC to BPA and DLH's commitment to pay SMC an overriding royalty of $1.00–$1.33 per ton on coal produced;

1. The conditions necessary for this transfer were not fulfilled and the transfer was never completed. Amended Complaint ¶ 81(a).

(e) a Coal Mining Agreement between DLH and SMC granting DLH the right to mine coal from the SMC leases, which rights DLH assigned to KII; and

(f) an Intercompany Agreement, wherein KII granted to EEC the exclusive right to market and sell all coal mined by KII.

Amended Complaint ¶ 49.

At meetings during approximately the same time as the closing of the March 1986 Agreements, plaintiffs allege that del Campo again declared to de Navasques, Powers, BPA and others that the Coal Supply Agreement was the primary guarantee for all parties' obligations to BPA. Amended Complaint ¶ 50.

Simultaneous with the negotiations of the March 1986 Agreements, Bertran allegedly put into effect a key component of his fraudulent scheme, i.e. the sale of Obanos and Logostable in return for $1 million, to be used, *inter alia,* for his personal benefit. During meetings in late 1985 and early 1986 (and prior to the closing of the March 1986 Agreements), Bertran told Hediger, who was acting for TCP, that the Coal Group would need working capital because the $1.9 million Revolving Credit Line to EEC could not be drawn upon until coal was actually shipped from the mine. Bertran proposed that TCP provide "bridge financing" to the Coal Group in the form of an investment in Obanos and Logostable, and that Bertran would arrange for 80% of the stock of Obanos and 100% of the stock of Logostable to be sold to TCP for $2 million.

It is alleged that Bertran, as Asland's chairman, falsely represented that: (i) Asland would, within one year, exercise its option to purchase Logostable for $1 million, thereby repaying $1 million to TCP; (ii) the Sugarloaf Mine would be highly profitable and that Obanos' 25% interest in the Coal Group would be very valuable, i.e., if 10% was worth $1 million, then 25% would be worth $2.5 million; (iii) each member of the Coal Group was a viable, highly profitable operating corporation; (iv) the Coal Supply Agreement guaranteed the operations of the Coal Group would be highly

profitable for many years; and (v) over a five-year period, the Coal Group would produce, sell and deliver to Asland quantities of coal aggregating over 3 million metric tons. Bertran never disclosed his ownership interest in Obanos and Logostable to Hediger. Amended Complaint ¶¶ 55–58.

At subsequent meetings during March 1986, in Switzerland, Bertran allegedly repeated his fraudulent representations. He presented a prospectus to Hediger, which plaintiffs allege de Navasques prepared at the direction of Bertran, regarding the proposed sale of Obanos and Logostable. In that prospectus, Bertran represented, *inter alia,* that Asland's performance of the Coal Supply Agreement would result in full payment of all debts owed to BPA and cover all costs involved in selling coal, and that this " 'captive market provides practically nil risk factor to this venture.' " Amended Complaint ¶ 59, quoting from the prospectus.

In reliance upon the representations made by Bertran and those contained in the prospectus, Hediger, on behalf of TCP, agreed in a written document dated March 25, 1986, with the owner/seller of Logostable and Obanos ("the TCP Agreement") to provide "bridge financing" of $2 million by acquiring 80% of the stock of Obanos and 100% of the stock of Logostable. The TCP Agreement specifically referenced the Coal Supply Agreement and Security and Loan Agreement and stated Asland held a one-year option to purchase 100% of the stock of Logostable for $1 million. In conjunction with the TCP Agreement, TCP paid Bertran $500,000 on or after March 25, 1986. Plaintiffs allege that, in October 1986, Bertran telephoned de Navasques in the United States and asked him to request another $500,000 from TCP. That additional $500,000 was paid in October 1986. The latter payment resulted in several meetings between Hediger and Bertran, between October 31 and November 3, 1986 in Zurich, wherein Bertran allegedly caused Asland to extend its time to exercise the option until June 16, 1987, in order to convince Hediger of Asland's commitment. Amended Complaint ¶ 69. It is alleged that none

of the monies paid by TCP were used for the benefit of the Coal Group and that at least $400,000 of the proceeds were diverted to Promociones Immobiliarias Golf de Ibiza, SA (PIGISA), which owned a golf course in Ibiza, Spain, and in which Bertran had a substantial ownership interest. This payment allegedly allowed PIGISA to meet obligations which Bertran had personally guaranteed. Other monies from the TCP Agreement, plaintiffs allege, were used by Bertran to pay additional personal debts. Also, Asland did not exercise its option to purchase Logostable. Thus, the $1 million that TCP had paid in 1986 was never returned. Amended Complaint ¶¶ 60–62.

At a KII board of directors meeting on April 30, 1986, and in a telex from Vinolas to Powers on May 8, 1986, Asland insisted that all efforts were to be made to place amounts of coal on the domestic and international markets so that Asland would be obligated to purchase only a minimum amount from the Sugarloaf Mine under the Coal Supply Agreement and that it wanted to be only a subsidiary resource for the purchase of coal. As Asland was only obligated to purchase what EEC could deliver, it could reduce its obligation by reducing production. Moreover, Asland had caused a provision to be included in the Coal Supply Agreement whereby any coal sold to third parties at prices equal to or greater than those under the Agreement would reduce the 300,000 metric tons which Asland was obligated to purchase. Amended Complaint ¶ 52. However, according to plaintiffs, the May 8, 1986 telex also contained statements in which Vinolas falsely and fraudulently represented that Asland still deemed the Coal Supply Agreement to be in effect and would comply with its terms. Amended Complaint ¶¶ 63–64.

It is alleged by plaintiffs that although Powers remained the nominal head of operations at the Sugarloaf Mine, Asland insisted its managers, technicians and other employees who were sent to the mine from Spain have authority over operations at the mine. Few of these employees had any coal mining experience and most spoke little or no English. Plaintiffs claim that in June 1986, Bertran telephoned de Navasques and directed him to telephone Powers and tell him that mining operations would be conducted by Asland personnel and that Powers should restrict his activities to marketing. Amended Complaint ¶¶ 65–66.

Plaintiffs claim that contrary to its representations, Asland did not use the Sugarloaf Mine to satisfy its coal needs, nor did it use its involvement in the mine to expand its United States operations. From the outset, it is alleged, Asland managed the mine in such a manner as to make performance of the Coal Supply Agreement impossible. Amended Complaint ¶ 67.

They further allege that due to Asland's mismanagement of the Sugarloaf Mine and Bertran's failure to turn over the $1 million in "bridge financing" from TCP, the mine ran out of funds and ceased activity in May 1987. Thus, the Coal Group was unable to make payments on the BPA loans, thereby causing BPA to declare the default of those loans and to commence proceedings to enforce the various guarantees executed in conjunction with the BPA loans. Amended Complaint ¶ 71.

BPA instituted suit in this Court on the Security and Loan Agreement and the loans made thereunder against the Coal Group, Powers, SMC and KIC (89 Civ. 0945) (Case I) and against Asland, Logostable, Obanos, de Navasques, Bertran, del Campo, Vinolas and Targhetta (89 Civ. 4970) (Case II). The present suit, 89 Civ. 6033, is referred to by the parties as Case III. Regarding Case II, which was dismissed with prejudice in November, 1990, defendants Asland, Bertran, del Campo, Vinolas and Targhetta agreed to a settlement with BPA, dated November 7, 1990. As a result of this agreement, Asland, Bertran, del Campo, Vinolas and Targhetta have submitted a motion to this Court to substitute themselves as plaintiffs for BPA in Case I. That motion was granted on October 27, 1992.

## DISCUSSION

Defendants have moved to dismiss the Amended Complaint and/or for summary

judgment upon all claims asserted against Bertran, del Campo, Vinolas and Targhetta, all claims under the Racketeer Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. §§ 1961–1968, and all of TCP's claims.

They argue that the Court has no subject matter jurisdiction over TCP's federal securities and RICO claims or, alternatively, that Switzerland is a more convenient forum to resolve TCP's claims. In conjunction with the dismissal of TCP's federal claims, defendants assert that it is also proper to dismiss TCP's non-federal claims. Defendants also argue that plaintiffs' claims against the Asland officers, alleging violations of RICO, federal and Arkansas securities laws, common law fraud, tort and breach of fiduciary duty are time-barred as they do not relate back to the date of the original complaint and the limitations periods for the subsequent claims have expired and must therefore be dismissed.

In addition, defendants contend that plaintiffs' RICO claims do not allege a "pattern of racketeering activity", which is required in order to plead a violation under 18 U.S.C. § 1962, and must therefore be dismissed for failure to state a claim. Finally, defendants assert that the following common law claims by plaintiffs must be dismissed for failure to state a claim: TCP's contract claim; TCP's claims for tortious interference with contracts; and the non-Coal Group's (KIC, SSC, TCP and Powers) claims for breach of fiduciary duty.

### A. Standards for Dismissal Pursuant to Rule 12(b)(6) and Summary Judgment Pursuant to Rule 56

#### 1. Rule 12(b)(6)

In considering a motion to dismiss for failure to state a claim upon which relief may be granted, a court is required to accept the facts alleged in the complaint as true. *Frasier v. General Electric Co.*, 930 F.2d 1004, 1007 (2d Cir.1991) (citing *Cooper v. Pate*, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964)). The complaint includes any written instrument attached to it as an exhibit and any statements or documents incorporated into it by reference. *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *Goldman v. Belden*, 754 F.2d 1059, 1065–66 (2d Cir.1985).

The court must read the complaint generously, and draw all reasonable inferences in favor of plaintiffs. *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989) (citing *Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 562 (2d Cir.1985)); *Pross v. Katz*, 784 F.2d 455, 457 (2d Cir.1986). The complaint may be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir.1991). Thus, "[t]he function of a [Rule 12(b)(6)] motion to dismiss 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 779 (2d Cir.1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir.1980)).

#### 2. Rule 56

Summary judgment may be granted when the moving party establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to relief as a matter of law." Fed.R.Civ.P. 56(c); *Rosen v. Thornburgh*, 928 F.2d 528, 532 (2d Cir.1991). If no rational fact finder could find in the nonmovant's favor, there is no genuine issue of material fact and summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). In making this determination, the court is not to resolve disputed issues of fact, but rather, while resolving ambiguities and drawing reasonable inferences against the moving party, to assess whether material factual issues remain for the trier of fact. *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990) (quoting *Knight v. U.S.*

*Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987)).

As an initial matter, the moving party must show that there is no genuine issue of material fact by relying on "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In asserting that there is a genuine issue for trial, the nonmoving party may not rest upon the mere allegations or denials in the nonmoving party's pleading. Rather, the nonmoving party's response must set forth, by affidavit or other form as indicated in Rule 56, specific facts showing that there is a material issue for trial. Fed.R.Civ.P. 56(e); *Law Firm of Daniel P. Foster, P.C. v. Turner Broadcasting System, Inc.*, 844 F.2d 955, 959 (2d Cir.), *cert. denied*, 488 U.S. 994, 109 S.Ct. 559, 102 L.Ed.2d 585 (1988); *see Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553.

Local Civil Rule 3(g), U.S.D.C., S.D.N.Y., requires that, upon a motion for summary judgment pursuant to Rule 56, the movant must submit a separate, short and concise statement of the material facts as to which it contends there is no genuine issue to be tried. Similarly, the non-movant is required to submit a separate, short and concise statement of the material facts as to which it contends there is a genuine issue to be tried. While the 3(g) statements submitted by the parties in the instant matter are certainly "short and concise," they do not provide the Court with all the information necessary to decide the motion. Under such circumstances, the Court may look beyond the 3(g) statements to other materials, such as affidavits, depositions and documentary evidence, submitted in connection with the motion. *See e.g. Lucky–Goldstar Int'l (America), Inc. v. S.S. California Mercury*, 750 F.Supp. 141, 143–44 (S.D.N.Y.1990); *Miller v. SwissRe Hold-*

*ing, Inc.*, 731 F.Supp. 129, 130 (S.D.N.Y. 1990); *United States v. One Hundred and Thirty–Four Thousand, Seven Hundred and Fifty–Two Dollars United States Currency, More or Less*, 706 F.Supp. 1075, 1082 n. 13 (S.D.N.Y.1989). Accordingly, the Court has based its decision on an examination of all exhibits submitted in connection with this action, pursuant to the general standards of Rule 56.

### B. *The Instant Motion*

#### 1. Subject Matter Jurisdiction Over TCP's Federal Claims

 When faced with a Rule 12(b)(1)[2] challenge in the context of a multi-pronged motion, " 'the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined.' " *Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n.*, 896 F.2d 674, 678 (2d Cir.1990) (quoting 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1350 (1969)).

Plaintiffs claim subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 1964 and 15 U.S.C. § 78aa. Section 1331 confers jurisdiction when there is a federal question. It provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Section 1964 confers jurisdiction to the district courts "to prevent and restrain violations of [RICO]." Section 78aa confers jurisdiction "of offenses and suits" under the Securities Exchange Act of 1934.

In the Amended Complaint, TCP, a Panama corporation, reasserted its claim against Asland for federal securities fraud, added a claim against Bertran for federal securities fraud, and joined with all other plaintiffs in asserting RICO claims against

---

**2.** Although defendants have not specifically indicated which subsection of Rule 12(b) this part of their motion falls under, defendants assert that "there is no subject-matter jurisdiction over the securities law and RICO claims of TCP."

Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint and/or for Summary Judgment at 55. Accordingly, the Court deems this prong of defendant's motion to be made pursuant to Rule 12(b)(1).

Asland and Bertran. Amended Complaint ¶¶ 142–143, 159, 160, 172, and 182.

### (a) *TCP's Federal Securities Fraud Claims*

■ TCP alleges that material false, deceptive and misleading representations were knowingly made by Bertran on his own behalf and on behalf of Asland to TCP, as well as omissions regarding certain material facts, with the intention of deceiving TCP or with a reckless disregard as to their truth or falsity, for the purpose of inducing TCP to enter into the March 25, 1986 TCP Agreement wherein TCP obligated itself to provide $2 million in "bridge financing" in the form of an acquisition of 80% of the stock of Obanos and 100% of the stock of Logostable (TCP ultimately paid $1 million pursuant to this agreement). TCP alleges that Bertran failed to disclose certain material facts regarding the proposed transaction, including: Bertran's personal interest in Obanos and Logostable; Asland's intention not to honor its obligations under the Coal Supply Agreement, and the fact that a principal purpose of the March 1986 Agreements and the related stock purchases and sales was for Bertran to fraudulently obtain money for his personal benefit. TCP further alleges that: (i) as a result of Bertran's fraudulent scheme, none of the $1 million provided by TCP for its stock ownership in Obanos and Logostable was used for the benefit of the Coal Group and that at least $400,000 of that amount was diverted by Bertran for his own personal use; and (ii) Asland's failure to exercise its option to purchase the stock of Logostable for $1 million within one year, upon which TCP was led to rely for repayment of its "bridge financing", and Asland's nonperformance of the March 14, 1986 Coal Agreement, upon which TCP relied for the success of the Coal Group and therefore the profitability of Obanos, proximately resulted in financial loss to TCP. Amended Complaint ¶¶ 133, 134, 135 and 148.

Defendants argue that there is no subject matter jurisdiction over TCP's securities law and RICO claims because: (1) the TCP transaction involved no conduct in the United States, and (2) the TCP transaction involved no detrimental effects to U.S. investors.

■ When courts address transnational frauds pursuant to the Securities Exchange Act, they must ascertain "'whether Congress would have wished the precious resources of the United States courts' to be devoted to such transactions." *Alfadda v. Fenn*, 935 F.2d 475, 478 (2d Cir.) (quoting *Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1045 (2d Cir.1983) (quoting *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 985 (2d Cir.), *cert. denied*, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975))), *cert. denied*, —— U.S. ——, 112 S.Ct. 638, 116 L.Ed.2d 656 (1991). In these decisions, the Second Circuit has identified two tests for determining whether a federal court has subject matter jurisdiction over a foreign plaintiff's securities fraud claim: the "conduct" test and the "effects" test. The parties here agree that TCP's federal securities claims must be heard by this Court if either the conduct test or the effects test is met. *See Alfadda v. Fenn*, 935 F.2d at 478; *Psimenos v. E.F. Hutton & Co.*, 722 F.2d at 1045.

### (i) *The Conduct Test*

■ Under the conduct test, a federal court has subject matter jurisdiction "if the defendant's conduct in the United States was more than merely preparatory to the fraud, and particular acts or culpable failures to act within the United States directly caused losses to foreign investors abroad." *Alfadda v. Fenn*, 935 F.2d at 478 (citing *Psimenos v. E.F. Hutton & Co.*, 722 F.2d at 1046 (citing *Bersch v. Drexel Firestone, Inc.*, 519 F.2d at 993)).

In *Bersch* the Second Circuit decided that suits by aliens should be heard only where conduct material to the completion of the fraud occurred in the United States and that mere preparatory activities and conduct far removed from the consummation of the fraud would not suffice to establish jurisdiction. Further, this circuit concluded that only where conduct "within the United States directly caused" the loss will a federal court have jurisdiction over suits by

foreigners who have lost money through sales abroad. *Bersch v. Drexel Firestone, Inc.*, 519 F.2d at 993; *see also IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1018 (2d Cir.1975) (foreign plaintiffs' suits under anti-fraud provisions of the securities laws should be heard only when substantial acts in furtherance of the fraud were committed within the United States.)

The named plaintiff in *Bersch* was a citizen of the United States while the class included thousands of purchasers who were mostly foreign. The company involved was an international corporation organized under Canadian laws. The prospectus stated that shares were not being offered in the United States, however several United States citizens received prospectuses and purchased shares. The Second Circuit found that, while various meetings between the issuer, underwriters, accountants and SEC officials discussing the offering took place in the United States, these acts were at most "preparatory," 519 F.2d at 987, and the district court lacked subject matter jurisdiction to hear claims by the foreign plaintiffs.

In the instant case, the managers and owners of TCP, a Panamanian corporation, are not United States nationals. Further, the discussions and meetings where misrepresentations were allegedly made to TCP, as well as the negotiations, drafting and execution of the TCP agreement, all took place in Switzerland. Moreover, Obanos and Logostable, the two companies in which TCP invested, were organized and exist under the laws of the Netherlands Antilles. Finally, the $1 million payment by TCP and the alleged diversion by Bertran of at least part of that $1 million also took place outside the United States. Thus, all of the activities constituting the alleged fraud on TCP occurred outside the United States.

The cases cited by TCP are distinguishable on their facts and therefore do not control the instant matter. In *Alfadda*, the fraud occurred when securities were sold in the United States, in violation of the prospectus provided to the foreign plaintiffs. The United States sales directly caused the dilution of the foreign plaintiffs' voting interests. Furthermore, the payments for the fraudulent sales were received and deposited in the United States. Thus, the fraud "occurred almost entirely in the United States." *Alfadda v. Fenn*, 935 F.2d at 477. In *Psimenos*, the foreign plaintiff, relying on representations printed in an E.F. Hutton & Co. flyer regarding the quality and experience of Hutton's money managers, opened an account with Hutton's Athens office. The court found that although most of the fraudulent misrepresentations occurred outside the United States, the trades made by Hutton in the United States were "material acts that directly caused Psimenos' claimed losses." *Psimenos v. E.F. Hutton & Co.*, 722 F.2d at 1044. In *Vencap*, a United States citizen, residing in the Bahamas, fraudulently diverted $3 million invested by foreign plaintiffs. The defendant used his Bahamian venture capital firm in the fraud. The firm was formed by the defendant's New York attorneys and drafts of the subscription agreement were actually exchanged in New York. The lower court found there was substantial activity in the United States, as there were hundreds of transactions and pieces of mail for Vencap which were initiated, directed and consummated from and received in New York. *IIT v. Vencap, Ltd.*, 519 F.2d at 1018.

In each of the foregoing cases, the defendants committed fraudulent acts in the United States which were more than preparatory; these fraudulent acts directly caused the foreign plaintiffs' losses. In the instant case, all of the activity related to TCP's alleged losses occurred outside the United States.

Plaintiffs' claim that Asland's "non-action" in the United States was a "material part of Bertran's fraudulent scheme which directly and substantially contributed to the diversion of the bridge financing," Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion at 94, is without merit. Asland had no responsibility to take any action in the United States with regard to any transfer of monies allegedly made to Obanos or Logostable abroad. TCP's alleged losses occurred as a result of the

diversion of the $1 million paid by TCP. The $1 million was paid and diverted outside the United States. The only contact with the United States regarding the TCP transaction was the telephone call from Bertran to de Navasques wherein Bertran sought an additional $500,000 payment from TCP after the initial $500,000 was paid. This call did not directly cause the TCP losses. The telephone call was, at best, a preparatory act.

In light of the foregoing, this Court finds that plaintiffs have failed to meet the requirements to establish subject matter jurisdiction under the conduct test.

### (ii) The Effects Test

■ Under the effects test, a federal court has jurisdiction where illegal activity abroad causes a "substantial effect" within the United States. *Alfadda v. Fenn*, 935 F.2d at 478; (citing *Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 261–62 (2d Cir.1989)).

TCP claims that Bertran's failure to deliver the $1 million to the Coal Group for working capital led to the collapse of the Sugarloaf Mine and the inability of the Coal Group to pay off the BPA loans. Thus, plaintiffs allege, Bertran's failure, despite his representations to the contrary, caused serious and substantial effects in the United States.

In the present case, TCP is not an American investor. Further, the stock of Obanos and Logostable are neither registered nor listed on a national securities exchange. Even if the stock of Obanos and Logostable had been sold to citizens of the United States, only those citizens, not TCP, would have standing to seek the extraterritorial protection of the United States securities laws. In *Schoenbaum v. Firstbrook*, 405 F.2d 200 (2d Cir.), *rev'd on other grounds*, 405 F.2d 215 (2d Cir.1968) (in banc), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969), the Second Circuit made this requirement regarding standing clear when it held that there is subject matter jurisdiction "over violations of the Securities Exchange Act although the transactions which are alleged to violate the Act take place outside the United States, at least when the transactions involve stock registered and listed on a national securities exchange, and are detrimental to the interests of American investors." *Schoenbaum v. Firstbrook*, 405 F.2d at 208 (citing *Ford v. United States*, 273 U.S. 593, 619–24, 47 S.Ct. 531, 539–41, 71 L.Ed. 793 (1927); *United States v. Pizzarusso*, 388 F.2d 8 (2d Cir.1968); *United States v. Aluminum Co. of America*, 148 F.2d 416, 443–44 (2d Cir.1945)). The Second Circuit, in *Vencap*, reiterated the *Schoenbaum* formulation, i.e. the belief that Congress' intent regarding extraterritorial application of the Exchange Act was "to protect domestic investors who have purchased foreign securities on American exchanges and to protect the domestic securities market from the effects of improper foreign transactions in American securities." *IIT v. Vencap*, 519 F.2d at 1017 (quoting *Schoenbaum v. Firstbrook*, 405 F.2d at 206).

TCP's claim that the alleged fraud resulted in the collapse of the Sugarloaf Mine and the inability of the Coal Group to pay off the BPA loans is somewhat analogous to that of the foreign plaintiffs in *Bersch*. There, the foreign plaintiffs argued that the collapse of I.O.S., Ltd., a Canadian mutual funds company with investments in United States securities, caused adverse general effects in the United States. *Bersch v. Drexel Firestone, Inc.*, 519 F.2d at 987. The Second Circuit rebuffed their argument, holding that subject matter jurisdiction over fraudulent acts, relating to securities, which are committed abroad exists "only when these result in injury *to purchasers or sellers of those securities in whom the United States has an interest*, not where acts simply have an adverse affect on the American economy or American investors generally." *Id.* at 989 (footnote omitted) (emphasis added). Thus, any detrimental effects must relate to purchasers or sellers in the United States and involve the same securities that are the subject of the alleged fraud. Such is not the situation in the present case. No American investor purchased shares in Obanos or Logostable and the stock of

these companies is not listed or available in the United States. Further, the shares of SSC, a publicly-traded company in the United States, which TCP claims were adversely affected by the failure of the Sugarloaf Mine, are completely distinct and unrelated to the companies in which TCP invested abroad. Accordingly, TCP does not meet the effects test.

### (b) *TCP's RICO Claim*

The RICO statute, like the Securities Exchange Act, is silent as to its extraterritorial application. However, the Supreme Court has stated "the heart of any RICO complaint is the allegation of a *pattern* of racketeering." *Agency Holding Corp. v. Malley–Duff & Associates*, 483 U.S. 143, 154, 107 S.Ct. 2759, 2766, 97 L.Ed.2d 121 (1987) (emphasis in original).

■ TCP has alleged numerous predicate acts, all but one of which are the alleged federal securities fraud violations. The securities claims have been dismissed by the Court in subsection B.1.(a), *supra.* The only other predicate act alleged with particularity by TCP is the telephone call in October 1986, from Bertran to de Navasques in the United States wherein Bertran asked de Navasques to telephone TCP and request an additional $500,000 payment. Amended Complaint ¶¶ 162(h), 174(1). This telephone call by itself, however, fails to constitute a pattern of racketeering. The minimum requirement for establishing a pattern is the existence of at least two acts of racketeering within a ten-year period. 18 U.S.C. § 1961(5).

■ Although plaintiffs allege that "[i]n late October 1986 Bertran made numerous telephone calls to de Navasques in Texas with respect to the Coal Group's need for cash," Amended Complaint ¶ 69, this allegation contains no specifics concerning the content of the calls and, therefore, provides no link between the TCP transaction and the United States. Further, because this allegation fails to plead with particularity any specific fraudulent statement made by Bertran, TCP's RICO claim must be dismissed pursuant to Rule 9(b), Fed.R.Civ.P., which requires that the pleading of fraud be stated with particularity. The court in

*C.A. Westel de Venezuela v. American Telephone & Telegraph Co.*, No. 90 Civ. 6665, 1992 WL 209641 (S.D.N.Y. Aug. 17, 1992), in holding that the plaintiff's RICO claim should be dismissed pursuant to Rule 9(b), stated that

> [i]n a civil RICO action in which the predicate acts consist of mail fraud or wire fraud, the plaintiff does not satisfy Rule 9(b) merely by pleading with particularity the communications transmitted by the mails or wires in furtherance of the scheme or artifice to defraud; rather, the plaintiff must plead with particularity the allegedly fraudulent statements themselves, regardless of the manner in which they were communicated.

*Id.* at *21.

■ However, in the instant action, the Court considers it appropriate to give TCP an opportunity to allege fraud with the particularity required by Rule 9(b). Rule 15(a), Fed.R.Civ.P., provides that "leave [to amend] shall be freely given when justice so requires." Furthermore, "[c]omplaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend." *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) (citation omitted). Thus, the Court will afford TCP the opportunity to replead its RICO claim.

For the reasons stated above, defendants' motion to dismiss TCP's RICO claim is granted with leave to replead the claim within 30 days of the date of this Opinion.

### (c) *Dismissal of TCP's Federal Claims*

Because TCP has failed to meet the requirements for subject matter jurisdiction for its federal securities and RICO claims, that part of defendants' motion seeking to dismiss TCP's federal claims pursuant to Rule 12(b)(1) is granted.

### 2. TCP's Non–Federal Claims

■ Since TCP's federal claims have been dismissed, this Court lacks subject matter jurisdiction over TCP's non-federal claims. Such "pendent jurisdiction can be relied upon only when there is a claim conferring federal jurisdiction that will survive a motion to dismiss." *IIT v. Vencap,*

*Ltd.,* 519 F.2d at 1015 (citing *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966)).

### 3. "Relation–Back" and Timeliness of the Amended Complaint

Defendants have not specified the federal rule of civil procedure under which they are moving for dismissal of plaintiffs' new claims in the Amended Complaint (including the addition of new defendants). Upon review of defendants' assertions in this regard, this Court deems that part of defendants' motion regarding the "relation-back" and timeliness of the Amended Complaint to be made pursuant to Rule 56.

#### (a) *"Relation–Back"*

When a plaintiff seeks to add new defendants in an amended complaint, a court may look at such factors as "the relationship between the new and old parties and whether the new party was on notice of the suit." 3 James W. Moore, *Moore's Fed. Practice* ¶ 15.08[5] (1992). See *Miller v. Steinbach,* 43 F.R.D. 275, 277 (S.D.N.Y. 1967).

 Defendants argue that the new claims against the new defendants do not relate back under Rule 15(c), Fed.R.Civ.P., because Rule 15(c) permits such amendment only "where there has been a 'mistake concerning the identity of the proper party' in the original pleading." Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint and/or for Summary Judgment (hereinafter "Defendants' Memorandum of Law") at 16 (citing Fed.R.Civ.P. 15(c)). However, contrary to defendants' assertion, Rule 15(c) is not limited to mistakes. Rule 15(c) has been given a much broader reading than defendants offer. See *Sounds Express Int'l. Ltd. v. American Themes and Tapes Inc.,* 101 F.R.D. 694, 697 (S.D.N.Y. 1984) ("the rule clearly covers not only cases where a party has been misnamed or misdescribed, but also cases where there exists 'a *possibility* that the plaintiff *may have* made a mistake in selecting the original defendants.' " *Id.,* quoting *Gabriel v. Kent General Hospital, Inc.,* 95 F.R.D. 391, 395 (D.Del.1982) (emphasis added by *Sounds Express* court). Thus, Fed. R.Civ.P. 15(c) "authorizes relation back in situations in which a new party is substituted or added, as well as those in which a party originally intended to be named has been misnamed or misdescribed." *Gabriel v. Kent General Hospital, Inc.,* 95 F.R.D. at 394 (citations omitted).

In particular, plaintiffs have been allowed "to add or substitute parties where there is an extremely close corporate or other relationship between the original and the added defendant, and accrues no prejudice to the new party." 3 James W. Moore, *Moore's Fed. Practice,* ¶ 15.08[5] (1992). See *Holiday Publishing Co. v. Gregg,* 330 F.Supp. 1326 (S.D.N.Y.1971).

 Bertran, del Campo, Vinolas and Targhetta, who were added as defendants in the Amended Complaint, are officers of Asland, S.A., the defendant in the original Complaint. Furthermore, Bertran, del Campo, Vinolas and Targhetta were certainly aware of possible litigation by plaintiffs in this case since BPA had asserted similar claims against the Asland officers. They should have known that plaintiffs were likely to file these claims upon completion of sufficient discovery to amend their complaint.

Defendants also argue that because the parties now sought to be sued were mentioned in the body of plaintiffs' original complaint, but were not named as defendants in that complaint, plaintiffs are precluded from subsequently adding those individuals as defendants. This argument is incorrect. Plaintiffs may subsequently add those individuals as defendants where any liability may not be fully known or proven at the time the action is commenced. In *Tokio Marine Management v. Japan Intermodal Transport Co.,* 1991 WL 238232 at *3, 1991 U.S.Dist. LEXIS 15977 at *9 (S.D.N.Y.1991), the court stated: "although plaintiff did not include the vessel [the new defendant] as a defendant in the original complaint, the complaint does name the vessel as having transported the VCRs; therefore, it would be unreasonable not to know that the vessel should have been named as a defendant." *See also* 6A

Charles A. Wright *et al., Federal Practice and Procedure* § 1498, at 125 (1990) ("Common sense, prudence, and efficiency suggest to the reasonable man that he should pursue his initial investigation and prepare his defense ... in such a manner as to collect and preserve evidence regarding all of the foreseeable actions arising from the event.")

As stated earlier, this case concerns claims against the Asland officers which were also made by BPA. Therefore, defendants should have expected plaintiffs to add these claims.

Defendants also argue that plaintiffs' RICO, fraud, tortious interference with contracts and breach of fiduciary duty claims do not relate back because they were not included in plaintiffs' original complaint. This argument is also without merit. As Fed.R.Civ.P. 15(c) makes clear, the amended claim need only arise "out of the conduct, transaction, or occurrence set forth ... in the original pleading." There is no requirement that the new claim must have been asserted in the original pleading. A single transaction or occurrence can give rise to numerous claims. An amendment "that changes only the legal theory of the action, or adds another claim arising out of the same transaction or occurrence, will relate back." 3 James W. Moore, *Moore's Federal Practice,* ¶ 15.15[3.–2], (1992). *See Barrett v. United States,* 622 F.Supp. 574, 592 (S.D.N.Y.1985), *aff'd,* 798 F.2d 565 (2d Cir.1986).

In light of the foregoing, this Court finds that plaintiffs' claims in the Amended Complaint relate back to the original Complaint, dated April 11, 1989, under Rule 15(c), Fed. R.Civ.P.

### (b) *Timeliness*

Defendants argue that, even if plaintiffs' federal securities claims relate back to the original Complaint, which was filed in April 1989, such claims are time-barred under a retroactive application of the one-year/

three-year uniform federal limitations rule with respect to private claims under § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) (1988) as adopted by the Second Circuit in *Ceres Partners v. GEL Assocs.,* 918 F.2d 349 (2d Cir.1990) and the Supreme Court in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* — U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). The one-year/three-year rule sets a limitations period of "the earlier of one year from the date the fraud was or reasonably should have been discovered or three years from the date of the transaction." *Henley v. Slone,* 961 F.2d 23, 24 (2d Cir.1992).

However, Congress has "amended the '34 Act [Securities and Exchange Act of 1934] by enacting section 27A to modify the retroactive effect." *Henley v. Slone,* 961 F.2d at 25 (citing Federal Deposit Insurance Corporation Improvement Act of 1991, § 476, Pub.L. 102–242, 1991 U.S.C.C.A.N. (105 Stat.) 2236).

The *Henley* court held that the clear statutory language of section 27A(a) [3] requires "the application of 'the laws applicable in the jurisdiction, including principles of retroactivity,'" to all suits pending on June 19, 1991, the date of the *Lampf* decision. *Henley v. Slone,* 961 F.2d at 26 (quoting section 27A(a)). The *Henley* court further held that applicable principles of retroactivity for the Second Circuit were enunciated in *Welch v. Cadre Capital,* 923 F.2d 989 (2d Cir.), *vacated sub nom. Northwest Sav. Bank, PaSa v. Welch,* — U.S. ——, 111 S.Ct. 2882, 115 L.Ed.2d 1048 (1991). *Henley v. Slone,* 961 F.2d at 26. Since the instant action was commenced prior to June 19, 1991 and prior to the *Ceres* decision, the Court now turns to *Welch* to ascertain whether the one-year/three-year *Ceres* statute of limitations should apply retroactively in the instant matter.

---

**3.** Section 27A(a) provides:
The limitation period for any private civil action implied under section 10(b) of this Act [the '34 Act] that was commenced on or before June 19, 1991, shall be the limitation

period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991. Pub.L. 102–242, 1991 U.S.C.C.A.N. (105 Stat.) 2236, 2387 (1991).

The *Welch* court, in turn, utilized the test set forth in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971) ("the *Chevron* test"), to determine whether the one-year/three-year *Ceres* rule should be applied retroactively to bar the plaintiffs' claims.

#### (i) The Chevron Test

The Supreme Court in *Chevron* held that, to qualify for purely prospective application, a decision must "establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed." *Chevron Oil Co. v. Huson*, 404 U.S. at 106, 92 S.Ct. at 355. If the decision satisfies the first part of the test, the court must then " 'weigh' in each case whether retroactive application would conflict with the purposes of the rule and whether it would produce inequitable results." *Welch v. Cadre Capital*, 923 F.2d at 993 (citing *Chevron Oil Co. v. Huson*, 404 U.S. at 106–07, 92 S.Ct. at 355–56).

#### (ii) The Welch Court's Application of the Chevron Test

In applying the *Chevron* test, the *Welch* court found that "adoption of a uniform federal limitations period changes the practice in this Circuit, which was clear at the time the alleged fraud was discovered, of looking to the law of the forum state for an appropriate statute of limitations for 10b–5 claims." *Welch v. Cadre Capital*, 923 F.2d at 994. Thus, the *Welch* court found that, although some of the Supreme Court's decisions which formed the doctrinal foundation for *Ceres'* rejection of the borrowing approach had already been decided by 1987 (which was around the time the *Welch* plaintiffs discovered the alleged fraud), the impending revision of a limitations period for 10b–5 claims was not so clearly indicated that the plaintiffs were chargeable with its prediction. *Welch v. Cadre Capital*, 923 F.2d at 994.

Second, the *Welch* court held that, because all statutes of repose "serve primarily individual, rather than institutional, interests and do so by giving potential litigants prior notice of their rights, application of a limitations period not yet in existence at the time suit was commenced clearly does not further ... the competing interests [of plaintiffs or defendants]." *Welch v. Cadre Capital*, 923 F.2d at 995.

Finally, the *Welch* court found no reason to fault plaintiffs for taking most of the then-applicable period after discovery of the alleged fraud to determine whether they had grounds for suit.

Accordingly, the *Welch* court held retroactive application of the rule in *Ceres* would unjustly deny plaintiffs' " 'right to a day in court.' " *Welch v. Cadre Capital*, 923 F.2d at 995 (quoting *Chevron Oil Co. v. Huson*, 404 U.S. at 108, 92 S.Ct. at 356).

#### (iii) Application of Welch/Chevron Test to Instant Matter

As in *Welch*, this Court finds that plaintiffs in the instant case, who allege discovery of the fraud in 1989, cannot be charged with the prediction of a revised statute of limitations period for 10b–5 claims. Plaintiffs here, who apparently relied on the five-year Arkansas statute of limitations, Ark.Code of 1987 Ann. § 16–56–115 (1992), filed their original complaint in Arkansas, in April 1989, approximately one year and seven months before the *Ceres Partners v. GEL Associates* decision was rendered on November 8, 1990.

In the pending case, as in *Welch*, this Court finds that the application of the new (and shorter) limitations period cannot affect the conduct of the plaintiffs here because the new rule was announced *after* the expiration of that period.

The Court, at this early stage of the litigation, accepts as true plaintiffs' statements that they did not discover the fraud until BPA filed suit in early 1989. Plaintiffs argue, based on documents produced by the parties in discovery, that "even after mining activity ceased in May 1987 and BPA called the loans, [d]efendants led [p]laintiffs and BPA to believe that they would work with them to find a solution to the problems of the Sugarloaf Mine."

Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion at 29.

This Court finds that "the plaintiffs are entitled, by virtue of their allegations of active concealment of fraud, to tolling of the limitations period until their discovery of the fraud." *Welch v. Cadre Capital,* 923 F.2d at 993 (citations omitted). One example supporting this finding is found in Exhibit C, annexed to Plaintiffs' Statement Pursuant to Local Civil Rule 3(g). Exhibit C is a copy of a letter dated June 10, 1988, addressed to "Mr. Joaquin [de] Navasques" with a copy to "Jerrod Daniels, Sugarloaf Mining", from "Joaquin Targhetta", wherein Targhetta states that "Asland has complied with all its obligations and is doing its part in attempting to solve these problems." Targhetta further states in this letter that "[w]e believe that it is in your best interest to discuss with Mr. Powers ways and means in reaching an orderly and appropriate restructuring of the operation, and therefore, we want to encourage you to talk to Mr. Powers with a view of solving all of these issues."

In light of the above, this Court finds that, under the principles of *Welch* and *Chevron,* the one-year/three-year rule should not be retroactively applied to plaintiffs' federal securities fraud claims.

Further, at this early stage in the litigation, no determination has yet been made concerning which state statute of limitations will be applied in the instant case. Nevertheless, plaintiffs' original Complaint was timely filed regardless of whether the six-year New York statute of limitations, N.Y.Civ.Prac.L. & R. 213 (McKinney 1992), or the five-year Arkansas statute of limitations is applied to plaintiffs' federal securities fraud claims.

In light of the foregoing analysis, as well as this Court's determination, in subsection B.3.(a) above, of "relation-back", it is unnecessary for the Court to discuss defendants' other contentions regarding the timeliness of the Amended Complaint.

### 4. The RICO Claims

Defendants seek dismissal of plaintiffs' RICO claims under Rule 12(b)(6), Fed.

R.Civ.P., and/or summary judgment under Rule 56, Fed.R.Civ.P.

Plaintiffs allege in their Amended Complaint that Asland and Bertran acquired or maintained, directly or indirectly, an interest in or control of SMC, the Coal Group, Logostable and Obanos through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(b); that Asland and Bertran participated, directly or indirectly, in the conduct of the affairs of SMC, the Coal Group, Obanos and Logostable through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), and that Asland and Bertran conspired to violate §§ 1962(b) and (c) in violation of 18 U.S.C. § 1962(d).

> Section 1962 provides, in relevant part,
>
> (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
>
> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such an enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
>
> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962(b), (c) and (d).

A private suit may be brought, under § 1964(c) by " '[a]ny person injured in his business or property by reason of a violation of § 1962.' " *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 495, 105 S.Ct. 3275, 3284, 87 L.Ed.2d 346 (1985) (quoting 18 U.S.C. § 1964(c)). The *Sedima* Court held "[i]f the defendant engages in a pattern of racketeering activity in a manner forbidden by [§ 1962(a)–(c) ], and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a

claim under § 1964(c)." *Id.* at 495, 105 S.Ct. at 3284. In *Holmes v. Securities Investor Protection Corp.,* ── U.S. ──, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), the Court ruled that a § 1964(c) suit carries a proximate cause requirement, i.e. that there must be some direct relation between the injury asserted and the alleged injurious conduct. *Id.* at ──, 112 S.Ct. at 1317–18.

■ Defendants seek dismissal of plaintiffs' RICO claims on the grounds that the alleged conduct does not meet the pattern of racketeering activity requirements of the statute because: (1) the alleged acts of racketeering activity on the part of Asland and Bertran were insufficiently related, and (2) the acts involved insufficient continuity or threat of continuity to violate the statute. Defendants' Memorandum of Law at 11, 36.

As the Second Circuit has recently noted, "[t]he elements of a 'pattern of racketeering activity' are not well defined." *McLaughlin v. Anderson,* 962 F.2d 187, 190 (2d Cir.1992). A minimum requirement for establishing the existence of such a pattern is the existence of at least two acts of racketeering within a ten year period. *Id.* (citing 18 U.S.C. § 1961(5)).

Plaintiffs here have alleged that Asland and Bertran each committed two or more acts after 1980 involving indictable mail or wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, and fraud in the sale of securities, in furtherance of a systematic scheme to defraud plaintiffs and others. Amended Complaint ¶¶ 160, 172, and 182.

■ In order to prove a pattern of racketeering activity plaintiffs must show that the predicate acts making up the pattern were related either to one another or to an external event or circumstance, *and* that there was sufficient continuity or threat of continuity among the predicate acts, in order to satisfy RICO's pattern requirements. *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 237, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989); *see also Beauford v. Helmsley,* 865 F.2d 1386, 1391 (2d Cir.) (in banc), *vacated and remanded for further consideration in*

*light of H.J. Inc.,* 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989), *aff'd on reconsideration,* 893 F.2d 1433 (2d Cir.), *cert. denied,* 493 U.S. 992, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989). The proof required to show a pattern of racketeering activity in a civil RICO suit brought under § 1964(c) is the same as that required in a criminal action. *Beauford v. Helmsley,* 865 F.2d at 1391 ("the substantive standards as to what must be proven in a criminal RICO prosecution also govern civil RICO actions."). The Supreme Court has indicated, however, that, although for analytic purposes the two elements of RICO's pattern requirement (relatedness and continuity) must be stated separately, in practice their proof will often overlap. *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. at 239, 109 S.Ct. at 2900.

### (a) The Relatedness Requirement

■ The relationship component of a pattern of racketeering activity is satisfied by " '[c]riminal conduct ... [which] embraces criminal acts that have the same or similar purposes, results, participants, victims or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. at 240, 109 S.Ct. at 2901 (quoting 18 U.S.C. § 3575(e) (subsequently repealed)). The Second Circuit in *Procter & Gamble Co. v. Big Apple Industrial Bldgs., Inc.,* 879 F.2d 10 (2d Cir.1989), *cert. denied,* 493 U.S. 1022, 110 S.Ct. 723, 107 L.Ed.2d 743 (1990), held that "the complaint sufficiently alleges the relatedness between predicate acts to demonstrate a pattern. The alleged acts had the same purpose, that is, fleecing the same victims ... and employing similar unlawful methods of commission." *Id.* at 19.

Plaintiffs here have alleged that the fraudulent scheme devised by Bertran and the acts carried out by Asland, Bertran, Del Campo, Vinolas and Targhetta all had the same purpose, i.e. to defraud plaintiffs of money, credit, assets and to gain an interest in, and control of, the Sugarloaf Mine, all for the personal benefit of Ber-

tran and for the corporate benefit of Asland. Amended Complaint ¶¶ 1 and 2.

This Court finds, at this early stage in the litigation, that the plaintiffs' allegations suffice to meet the relatedness requirement necessary to establish a pattern of racketeering activity.

### (b) The Continuity Requirement

Regarding continuity, the Supreme Court has stated:

> "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition ... A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated.

*H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. at 241–242, 109 S.Ct. at 2902 (emphasis in original).

The defendants here argue that "plaintiffs make no allegation whatever that the alleged scheme possessed an 'open-ended' continuity, as ... defined in *H.J. Inc.*"; that they merely allege a " 'closed-ended' scheme, with the predicate acts 'extending over a few weeks or months' ", and that plaintiffs' allegations that acts of wire and mail fraud took place over a period of time cannot, alone, constitute the 'continuity' required by *H.J. Inc.*" Defendants' Memorandum of Law at 40, quoting from *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. at 242, 109 S.Ct. at 2902, and Defendants' Memorandum of Law at 44.

In order to plead predicate acts of mail and wire fraud, the plaintiffs must plead facts which demonstrate a deprivation of a property right or interest. *Corcoran v. American Plan Corp.*, 886 F.2d 16, 21 (2d Cir.1989) (plaintiff fails to state a claim under mail fraud statute if he has not alleged "any property right or interest in the monies that defendants allegedly stole from plaintiff"); *Philan Insurance Ltd. v. Frank B. Hall & Co.*, 748 F.Supp. 190, 195 (S.D.N.Y.1990) (citing *McNally v. United States*, 483 U.S. 350, 360, 107 S.Ct. 2875, 2882, 97 L.Ed.2d 292 (1987)) (mail fraud statute "limited in scope to the protection of property rights"). Plaintiffs here have alleged such property rights and interests. As noted earlier, the plaintiffs in this case have alleged that the fraudulent scheme devised by Bertran and the acts carried out by Asland, Bertran, Del Campo, Vinolas and Targhetta all had the same purpose, i.e. to defraud plaintiffs of money, credit, assets and to gain an interest in, and control of, the Sugarloaf Mine. Amended Complaint ¶¶ 1 and 2.

In addition, the Second Circuit, in *United States v. Indelicato*, 865 F.2d 1370, 1381 (2d Cir.1989) (in banc), *cert. denied*, 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989), held that racketeering acts that are not widely separated in time or space may nonetheless, given other evidence of the threat of continuity, constitute a RICO pattern. Further, the Second Circuit in *Beauford* concluded that

> a RICO pattern may be adequately pleaded without an allegation that the scheme pursuant to which the racketeering acts were performed is an ongoing scheme having no demonstrable ending point. We reach this conclusion because nothing in the statute or the legislative history reveals an intent to require such an open-ended scheme. What is required is that the complaint plead a basis from which it could be *inferred* that the acts of racketeering activity were neither isolated nor sporadic.

*Beauford v. Helmsley*, 865 F.2d at 1391 (emphasis added); *see Procter & Gamble Co. v. Big Apple Industrial Bldgs., Inc.*, 879 F.2d at 18.

Plaintiffs here have alleged that defendants gained control of the operations of the Sugarloaf Mine through a scheme to defraud plaintiffs; that the scheme evolved

during a period of almost two years, and that during that period the defendants committed various acts of securities fraud and mail or wire fraud. Amended Complaint ¶ 2. The Supreme Court has stated that "[a] RICO pattern may surely be established if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. at 242, 109 S.Ct. at 2902.

In reading the plaintiffs' complaint liberally, as a court is bound to do in the context of a 12(b)(6) motion, this Court finds that plaintiffs' allegations, at this preliminary stage of the litigation, suffice to meet the relatedness and continuity requirements of a pattern of racketeering activity, and declines to dismiss plaintiffs' RICO claims. For the same reasons, the Court declines to grant summary judgment on plaintiffs' RICO claims as a matter of law.

### 5. Common Law Claims

Defendants argue that certain common law claims asserted by plaintiffs fail to state a claim as a matter of law and must therefore be dismissed pursuant to Rule 12(b)(6) and/or Rule 56.

In the Amended Complaint, plaintiffs claim that del Campo, Vinolas and Targhetta, as directors and officers of each of the companies comprising the Coal Group, failed to discharge their fiduciary duty to the Coal Group and its shareholders (including, directly KIC, Logostable and Obanos, and, indirectly, Powers, SSC and TCP) to oversee the operations of each company in the Coal Group and insure that those companies properly conducted their businesses. Also, plaintiffs allege that del Campo, Vinolas and Targhetta were negligent and careless in the conduct of their fiduciary duties such that the funds and property of the Coal Group were squandered, grossly mismanaged and wasted which resulted in the inability of the members of the Coal Group to satisfy their obligations to BPA and to each other. Amended Complaint ¶ 203. Furthermore, plaintiffs claim that Asland and Bertran, through their control of del Campo, Vinolas and Targhetta, induced those defendants to breach their fiduciary duties to the Coal Group. Amended Complaint ¶ 202.

Defendants seek dismissal of the claims of SSC, KIC, TCP[4] and Powers because the directors and officers owed fiduciary duties to the Coal Group and not to its shareholders. They contend that KIC, as a shareholder of the three companies comprising the Coal Group, and that Powers (shareholder of KIC), may not bring an action when the company of which they are shareholders has sued for the same relief and, "*a fortiori*, shareholders of shareholders also have no standing to bring such claims." Defendants' Memorandum of Law at 53. Also, defendants assert that SSC has no standing to assert claims for breach of fiduciary duty because it has not been alleged that the transfer of 66% of the stock of SMC by SSC to DLH, subject to an agreement entered into in March 1986, was ever made. Defendants' Memorandum of Law at 53–54 and Amended Complaint ¶ 81(a).

Because fiduciary duties generally are said to be owed to a corporation and not to a particular stockholder, the enforcement of such duties must be in the name of the corporation. 19 William M. Fletcher, *Fletcher Cyclopedia of Private Corporations* § 5:06 at 573 (1988); *see St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 562 F.2d 1040, 1055 (8th Cir.1977), *cert. denied*, 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978) ("directors generally do not occupy a fiduciary position with respect to stockholders in face to face dealings.")

However, an exception exists where an individual stockholder suffers an injury separate and distinct from that suffered by other shareholders. Thus, the injury to the plaintiff must arise out of plaintiff's relationship to the transaction complained of

---

**4.** Since this Court has already determined that it has no subject matter jurisdiction over TCP's federal law claims and therefore no jurisdiction over TCP's pendent common law claims, it is not necessary for the Court to address this assertion regarding TCP.

other than as a shareholder. 19 William M. Fletcher, *Fletcher Cyclopedia of Private Corporations* § 5:06 at 573 (1988); *ZB Holdings, Inc. v. BBA Group PLC*, No. 91 Civ. 4486, 1992 WL 309812, at \*3 (S.D.N.Y. Oct. 14, 1992) ("an individual shareholder may bring an action on his own behalf against a corporate officer for breach of fiduciary duty where his loss is 'separate and distinct from that of the corporation.'") (quoting *Hite v. Thomas & Howard Co.*, 305 S.C. 358, 409 S.E.2d 340, 342 (1991)).

### (a) *KIC's Claim*

With regard to KIC, this Court will allow its individual common law claim to stand. In addition to losses suffered as a shareholder, KIC claims losses of promised royalties of $4.00–$4.75 per ton on coal produced and sold to Asland under the Coal Supply Agreement. Amended Complaint ¶ 39d. These alleged losses are separate and distinct from those suffered by the other shareholders. Thus, this Court declines to dismiss KIC's claim for breach of fiduciary duty. Summary judgment regarding this claim is also denied as a matter of law.

### (b) *SSC's Claim*

As to SSC's claim, this Court finds that there is no shareholder relationship between SSC and DLH. Thus, SSC has no standing to sue for breach of fiduciary duty and defendants' motion to dismiss regarding this claim is granted.

### (c) *Powers' Claim*

With regard to Powers' claim, this Court finds that no fiduciary relationship exists between Powers and Vinolas, del Campo and Targhetta as corporate officers and directors of the Coal Group. "'[A]t the heart of the fiduciary relationship' lies 'reliance, and de facto control and dominance.'" *United States v. Chestman*, 947 F.2d 551, 568 (2d Cir.1991) (in banc) (quoting *United States v. Margiotta*, 688 F.2d 108, 125 (2d Cir.1982)), *cert. denied*, — U.S. —, 112 S.Ct. 1759, 118 L.Ed.2d 422 (1992). The *Chestman* court listed attorney and client, executor and heir, guardian and ward, principal and agent, trustee and trust beneficiary, and senior corporate official and shareholder as some examples of fiduciary relations. *United States v. Chestman*, 947 F.2d at 568. In light of the foregoing, Powers, as guarantor of $2 million of the Coal Group's obligations to BPA, is not in a traditional fiduciary relationship with the corporate officers and directors of the Coal Group. Furthermore, it is apparent that Powers, in his capacity as a shareholder of KIC (which, in turn, is a shareholder of the Coal Group), has no fiduciary relationship with the defendant corporate officers and directors, as this relationship is too remote, despite the fact that he is the sole stockholder of KIC. "Regardless of the identity of financial interests between corporation and shareholder, he cannot employ the corporate form to his advantage in the business world and then choose to ignore its separate entity when he gets to the courthouse." 12B William M. Fletcher, *Fletcher Cyclopedia of Private Corporations* § 5910 at 418 (1984). This is precisely what Powers seeks to do here. Therefore, defendants' motion to dismiss with regard to Powers' breach of fiduciary duty claim is granted.

### CONCLUSION

For the foregoing reasons, defendants' motion to dismiss pursuant to Rule 12(b), Fed.R.Civ.P., and/or for summary judgment pursuant to Rule 56, Fed.R.Civ.P., is granted in part and denied in part. The parties are directed to complete discovery by March 29, 1993 and to file a joint pretrial order by April 29, 1993.

Settle order on notice.