**John PSIMENOS, Plaintiff-Appellant,**

v.

**E.F. HUTTON & COMPANY, INC., Defendant-Appellee.**

**No. 43, Docket 83–7178.**

United States Court of Appeals, Second Circuit.

Argued Sept. 14, 1983.

Finally Submitted Oct. 26, 1983.

Decided Nov. 28, 1983.

Michael C. Devine, New York City (Kieffer & Hahn, New York City, of counsel), for plaintiff-appellant.

Thomas J. Kavaler, New York City (Cahill Gordon & Reindel, New York City, Thomas F. Curnin, Joel E. Davidson, Julie A. Petruzzelli, New York City, of counsel), for defendant-appellee.

Kenneth M. Raisler, Gen. Counsel, Commodity Futures Trading Com'n, Washington, D.C. (Pat G. Nicholette, Deputy Gen. Counsel, Jeri E. Ruscoll, Washington, D.C., of counsel), for Commodity Futures Trading Com'n, as amicus curiae.

Daniel L. Goelzer, Gen. Counsel, S.E.C., Washington, D.C. (Jacob H. Stillman, Associate Gen. Counsel, Elisse B. Walter, Asst. Gen. Counsel, Elizabeth E. Ashcraft and Paul Gonson, Sol., Washington, D.C., of counsel), for S.E.C., as amicus curiae.

Before FEINBERG, Chief Judge, and LUMBARD and NEWMAN, Circuit Judges.

LUMBARD, Circuit Judge:

Plaintiff John Psimenos, a citizen and resident of Greece, brought this action under the anti-fraud provisions of the Commodities Exchange Act, 7 U.S.C. § 1 et seq. (1982) ("CEA"),[1] as well as under common

---

**1.** Section 4b of the Act, 7 U.S.C. § 6b (1982) declares it unlawful for members of a contracts market, or any of their associates, in connection with commodities contracts:

    ... (A) to cheat or defraud or attempt to cheat or defraud such other person;

    (B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;

    (C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person; or

    (D) to bucket such order, or to fill such order by offset against the order or orders of any other person, willingly or knowingly and without the prior consent of such person to become the buyer in respect to any selling order of such person, or become the seller in respect to any buying order of such person

    . . . .

Psimenos also alleges violations of §§ 4d and 4k of the Act, 7 U.S.C. 6d and 6k (1982). 7 U.S.C. § 6d prohibits persons from acting as a futures commission merchant (fcm) or intro-

law contract and agency principles against E.F. Hutton & Company, a Delaware corporation having its principal place of business in New York, for damages resulting from Hutton's allegedly fraudulent procurement and management of his commodities trading account.

Hutton moved pursuant to Fed.R.Civ.P. 12(b)(1) to dismiss the federal claims for lack of subject matter jurisdiction, and to dismiss the diversity claims for improper pleading, Fed.R.Civ.P. 9(b). Chief Judge Motley, holding that the alleged fraud was "predominantly foreign" and therefore outside the scope of the Commodities Exchange Act, dismissed the federal claim for lack of subject matter jurisdiction.[2] 560 F.Supp. 1111 (S.D.N.Y.1983). We disagree with Judge Motley's reading of the jurisdictional limitations of the Act and, accordingly, reverse and remand for further proceedings.[3]

Since we are reviewing a motion to dismiss, we take the facts to be as stated in the plaintiff's amended complaint. *IIT v. Cornfeld,* 619 F.2d 909, 914 (2d Cir.1980).

In 1975, plaintiff became interested in investing in a commodities trading account with E.F. Hutton. Mathieu Mavridoglou, Hutton's agent and employee in Athens, told Psimenos "that his account would be managed in accordance with Hutton's standard procedures and with rules and regulations of the Commodities Futures Trading Commission." Psimenos was also informed by a flyer, printed by Hutton, of the quality and experience of Hutton's money managers. The flyer touted that Hutton's "experienced and qualified staff continually monitors the performance of each current Hutton approved manager ..." and that "Hut-

ton's professionals thoroughly analyze and evaluate these managers in a manner beyond the resources of the ordinary investor." This flyer contained a tear-off post card to send to Hutton's New York office for more information.

Relying on these statements, Psimenos opened an account with Hutton's Athens office, executing blank forms that granted Hutton discretionary authority to trade in his account. Although Psimenos directed Mavridoglou to seek conservative investments, Hutton's agents often used money in Psimenos' account to participate in unresearched and highly speculative and leveraged transactions.

By 1977, after having incurred heavy losses, Psimenos talked in Athens with Mavridoglou, and in Geneva with Mavridoglou and a Mr. Tome, another Hutton employee. Through these conversations, he was induced to have his account moved to Hutton's Paris office. Mavridoglou and Tome told Psimenos that Hutton's Paris representative would place only completed, profitable trades in his account until he had recouped his losses. These representations were false, since Hutton did not place only such "good" trades in his account, and did not make up Psimenos' losses. At some point, the exact date being unstated in the amended complaint, Psimenos ordered trading halted in his account.

In 1981, Mavridoglou convinced Psimenos to move the account back to Athens and to allow trading in his account to resume. Mavridoglou told Psimenos that Hutton would recoup all his losses by assigning a new manager, Marios Michaelides, to the account. Michaelides was represented as a

---

ducing broker without registering with the Commodities Future Trading Commission. 7 U.S.C. § 6k requires registration of those associated with an fcm or introducing broker.

**2.** The district court's ruling also dismissed the diversity claim for lack of sufficient allegations of diversity of citizenship and dismissed the pendent claims because of the threshold failure of the federal and diversity claims. Thereafter the parties stipulated that plaintiff's motion to replead was withdrawn with prejudice, and the district court thereupon ordered the action discontinued.

**3.** At our invitation, the Securities and Exchange Commission and the Commodities Futures Trading Commission each submitted a brief as *amicus curiae* urging us to find that the district court has subject matter jurisdiction to hear Psimenos' claim. The CFTC argues that trading on domestic commodities markets is sufficient to establish jurisdiction both because it involves substantial conduct in the United States and because it implicates the integrity of the United States markets.

Hutton employee and qualified broker, though in fact he was not a Hutton employee, and was not nor had he ever been registered with the Commodities Futures Trading Commission as a broker.

Psimenos again told Mavridoglou that he wanted only low risk investments. He was told that Michaelides would trade on Psimenos' behalf only in United States Treasury Bill futures, which were represented as being risk-free. As a show of good faith, Michaelides said he would join Psimenos as a partner in his first trade, which turned out to be profitable. Later trades, however, resulted in large losses and Hutton began "churning" the account simply to generate commissions. Eventually, Psimenos lost in excess of $200,000.

In short, Psimenos alleges that, contrary to Hutton's representations, his account was not handled by qualified managers. In 1981, the manager assigned to Psimenos was neither a Hutton employee nor a registered broker. Several times, managers failed to close commodity purchase contracts by sale, with the result that Psimenos was forced to take possession of the commodity at an additional expense for which he was unprepared. Moreover, Hutton did not evaluate the performance of its managers, and did not monitor Psimenos' account as it had represented it would. Contrary to Psimenos' instructions, high risk trades were conducted in his account, resulting in significant losses.

Although most of the fraudulent misrepresentations alleged in the complaint occurred outside the United States, the trading contracts that consummated the transactions were often executed in New York.[4] The issue on appeal is whether that trading in United States commodities markets is sufficient to confer subject matter jurisdiction on a federal district court to hear a claim for damages brought by an alien under the Commodities Exchange Act.[5]

We find that the district court has jurisdiction to hear Psimenos' claim. The trades Hutton executed on American markets constituted the final act in Hutton's alleged fraud on Psimenos, without which Hutton's employees could not have generated commissions for themselves. Coming as they did as the culminating acts of the fraudulent scheme, such trading could hardly be called "preparatory activity" not subject to review under the anti-fraud provisions of the CEA. *IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1018 (2d Cir.1975). On the contrary, Hutton's trades in the United States, involving domestic futures contracts, were material acts that directly caused Psimenos' claimed losses.

In construing the reaches of jurisdiction under the CEA, courts have analogized to similar problems under the securities laws which have been more extensively litigated. *See, e.g., Mormels v. Girofinance, S.A.,* 544 F.Supp. 815, 817 n. 8 (S.D.N.Y.1982) ("[s]ecurities cases and principles are used as persuasive aids to interpretation of the CEA"); *Miller v. New York Produce Exchange,* 550 F.2d 762, 769 n. 2 (2d Cir.), *cert. denied,* 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977); *CFTC v. J.S. Love & Assoc. Options,* 422 F.Supp. 652, 660 (S.D.N.Y. 1976).

Several of our decisions have explored the limits of subject matter jurisdiction under the federal securities statutes. Our major consideration concerning transnational

---

**4.** Plaintiff's complaint alleges, and defendant concedes, that "certain" of the purchases and sales in the account were executed on contract markets in New York. On appeal, Psimenos states (Br. at 4) that "virtually all of the trades" were executed on United States contract markets. He cites accountings he received in an exhibit in his Memo in Opposition to Motion to Dismiss.

**5.** There can be little doubt that if subject matter jurisdiction exists, Psimenos' complaint states a cause of action. Psimenos alleges material misrepresentations about the nature of the organization handling his account, the people he was dealing with, and the type of trading his funds were being used for. The Supreme Court, in *Merrill Lynch, Pierce Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 358, 102 S.Ct. 1825, 1828, 72 L.Ed.2d 182 (1982), held that private causes of action under the anti-fraud provisions of the CEA which existed before Congress last amended the CEA (Commodity Futures Trading Commission Act of 1974, 88 Stat.1839), survived those amendments.

transactions is "whether Congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to them rather than leave the problem to foreign countries." *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 985 (2d Cir.), *cert. denied sub nom. Bersch v. Arthur Anderson & Co.,* 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975).

Two tests have emerged, the "effects" test, as announced in *Schoenbaum v. Firstbrook,* 405 F.2d 200 (2d Cir.), *rev'd with respect to holding on merits,* 405 F.2d 215 (2d Cir.1968) (en banc), *cert. denied sub nom. Manley v. Schoenbaum,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969), and the "conduct" test. Since we find that there is jurisdiction under the latter, we do not need to reach the question whether the effects test provides an independent basis for jurisdiction.

■ The conduct test does not center its inquiry on whether domestic investors or markets are affected, but on the nature of conduct within the United States as it relates to carrying out the alleged fraudulent scheme, on the theory that Congress did not want "to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners." *Vencap, supra,* 519 F.2d at 1017.

This test was originally applied by us in *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326 (2d Cir.1972). Plaintiffs, United States citizens, alleged fraud surrounding their purchase through British brokers on the London Stock Exchange of a British corporation whose stock was not registered or traded on United States exchanges. While we stated that "the adverse effect of the fraudulently induced purchases in England of securities of an English corporation, not traded in an organized American securities market, upon an American corporation," (468 F.2d at 1336) was insufficient to create jurisdiction under *Schoenbaum,* we nevertheless upheld jurisdiction because "substantial misrepresentations were made in the United States." 468 F.2d at 1337. Thus, domestic conduct alone was sufficient to trigger the applica-

bility of the securities laws to a transaction occurring abroad. *Accord, Travis v. Anthes Imperial Ltd.,* 473 F.2d 515 (8th Cir.1973).

We later clarified *Leasco* in *Bersch, supra.* There, the named plaintiff was a citizen of the United States, but the class included thousands of purchasers, mostly foreign, of an international corporation organized under Canadian laws. While the prospectus stated that shares were not being offered in the United States, several United States citizens received prospectuses and purchased shares. Among other things, various meetings between the issuer, underwriters, accountants and SEC officials discussing the offering took place in the United States. The opinion linked the relative importance of the necessary conduct within the United States to the citizenship and residence of the purchasers of securities; it pointed out that the anti-fraud provisions of the federal securities laws:

(1) Apply to losses from sales of securities to Americans residing in the United States whether or not acts (or culpable failures to act) of material importance occurred in this country; and

(2) Apply to losses from sales of securities to Americans residing abroad if, but only if, acts of material importance in the United States have significantly contributed thereto; but

(3) Do not apply to losses from sales of securities to foreigners outside the United States unless acts (or culpable failures to act) within the United States directly caused such losses.

519 F.2d at 993. Since the acts occurring in the United States in *Bersch* were at most "preparatory," 519 F.2d at 987, we held that the district court lacked subject matter jurisdiction to hear claims by foreign plaintiffs.

In *IIT v. Vencap,* 519 F.2d 1001 (2d Cir. 1975), decided the same day as *Bersch,* we reiterated our holding that foreign plaintiffs' suits under anti-fraud provisions of the securities laws would be heard only when substantial acts in furtherance of the fraud were committed within the United States:

Our ruling on this basis of jurisdiction is limited to the perpetration of fraudulent acts themselves and does not extend to mere preparatory activities or the failure to prevent fraudulent acts where the bulk of the activity was performed in foreign countries, as in *Bersch*. Admittedly, the distinction is a fine one. But the position we are taking here itself extends the application of the securities laws beyond prior decisions and the line has to be drawn somewhere if the securities laws are not to apply in every instance where something has happened in the United States, however large the gap between the something and a consummated fraud and however negligible the effect in the United States or on its citizens.

519 F.2d at 1018.

We find that under the conduct test, Hutton's activities in the United States in furtherance of the alleged fraud were substantial enough to establish subject matter jurisdiction. First, Hutton's pamphlet, promising continual supervision of highly qualified managers, emanated from Hutton's New York office. This may be considered substantial if, as Psimenos claims, it induced him to open and maintain an account with Hutton. *See Hirk v. Agri-Research Council, Inc.,* 561 F.2d 96, 103–04 (7th Cir.1977). That by itself, however, would not be enough to sustain jurisdiction. *Cf. Bersch, supra,* at 985 n. 24. Far weightier is the fact that Hutton's agents completed the alleged fraud by trading domestic futures contracts on American commodities exchanges.

■ Judge Motley construed the language in *Vencap* limiting relevant conduct to "fraudulent acts themselves" to mean that since the trades which took place on United States markets were not fraudulent in that they were ordinary business transactions, they were not reviewable conduct. 560 F.Supp. at 1114. We disagree. *Bersch* reveals that our true concern was that we entertain suits by aliens only where conduct material to the completion of the fraud occurred in the United States. Mere preparatory activities, and conduct far removed from the consummation of the fraud, will not suffice to establish jurisdiction. Only where conduct "within the United States directly caused" the loss will a district court have jurisdiction over suits by foreigners who have lost money through sales abroad. *Bersch, supra,* 519 F.2d at 993. Viewing the conduct test in this light, it is clear that the trading conducted by Hutton on United States exchanges should be weighed in determining this court's jurisdiction. Just as Congress did not want the United States to be used as a base for manufacturing fraudulent securities devices, irrespective of the nationality of the victim, *Bersch, supra,* neither did it want United States commodities markets to be used as a base to consummate schemes concocted abroad, particularly when the perpetrators are agents of American corporations.

■ Our decision in *IIT v. Cornfeld,* 619 F.2d 909 (2d Cir.1980), supports our holding in this case. There, an international trust purchased the common stock of one United States company and the convertible note of another. We stated there that "we have no difficulty in finding subject matter jurisdiction .... Apart from the fact that these were securities of American corporations, the transactions were fully consummated within the United States." 619 F.2d at 918. While we stressed that we were not holding that either of these factors was necessary or sufficient condition for finding jurisdiction, "the presence of both these factors points strongly toward applying the antifraud provisions of our securities laws." *Id.*[6]

**6.** Other courts have gone further in finding subject matter jurisdiction. *See Grunenthal GmbH v. Hotz,* 712 F.2d 421, 425 (9th Cir.1983) (subject matter jurisdiction found where execution of an agreement involving foreign citizens and foreign securities occurred in the United States); *Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc.,* 592 F.2d 409, 420 (8th Cir.1979) (jurisdiction upheld on transaction where sole victim was foreign corporation and securities not traded on any American Exchange where conduct in the United States was "significant with respect to the alleged violation"); *SEC v. Kasser,* 548 F.2d 109 (3d Cir.), *cert. denied sub nom. Churchill Forest Indus-*

Both these factors are present in this case. The commodity futures contracts involved are domestic: they are created by domestic exchanges and may lawfully be traded only on those exchanges. CFTC Brief at 7; see U.S.C. § 6a (1982); *In the Matter of Wiscope, S.A.* [1977–1980 Transfer Binder], Comm.Fut.L.Rep. (CCH) ¶ 20,-785 at 23,199 (CFTC March 19, 1979), *vacated on other grounds sub nom. Wiscope S.A. v. Commodity Futures Trading Commission,* 604 F.2d 764 (2d Cir.1979) (Whereas securities often "can be moved from place to place, bought, sold, traded or borrowed outside a central market, a commodity futures contract has no lawful existence or being independent of the designated contract market upon which it is traded.").

The commodities futures contracts at issue here present at least as strong a factor in favor of finding jurisdiction as do securities of a United States corporation traded in the United States. Since in this case, trading which consummated the alleged fraud occurred on United States markets, both of the factors that led us to find jurisdiction in *Cornfeld* are satisfied, and subject matter jurisdiction exists to hear suits by foreigners claiming the protection of the anti-fraud provisions of the Commodities Exchange Act.

The fact that United States commodities markets were used to consummate the alleged fraud here distinguishes *Mormels v. Girofinance, S.A.,* 544 F.Supp. 815, 817 (S.D. N.Y.1982), upon which the district court relied. In that case, Mormels alleged that he and several others opened a commodities trading account in Costa Rica with Girofinance, a Costa Rican corporation that misrepresented itself as Hutton's agent. Plaintiffs claimed that Girofinance converted their funds in Costa Rica, and fled. Judge Weinfeld ruled that no subject matter jurisdiction existed since every fact necessary to complete the fraud, including misrepresentation, delivery of funds, and conversion of funds, occurred in Costa Rica. 544 F.Supp.

at 815. Thus, no act which directly caused Mormels' loss occurred in the United States; in contrast, in this case, the essential conduct needed to complete the fraudulent scheme, executing contracts on commodities markets, occurred in the United States.

Only one case has addressed the precise fact situation we face here. In *Tamari v. Bache & Co., (Lebanon) S.A.L.,* 547 F.Supp. 309 (N.D.Ill.1982), *appeal docketed,* No. 83–2452 (7th Cir., August 4, 1983), plaintiffs, Lebanese investors, placed commodities futures orders in Lebanon which were executed in Chicago commodities markets. They alleged that Bache Lebanon [7] misrepresented its expertise, gave false market advice, and mismanaged their accounts. They sued both under the CEA and principles of common law fraud.

We agree with that portion of the Illinois district court's opinion that held that plaintiffs had established jurisdiction under the conduct test. Bache Lebanon's transmission of the plaintiff's orders from Beirut to Chicago constituted conduct within the United States that was so important to the scheme as to satisfy *Bersch* and *Vencap.* The court concluded:

> Bache Lebanon's wiring of the Tamaris' orders to Chicago and the execution of those orders on the Chicago exchanges were the final steps in the alleged scheme. And ... the "lawfulness" of Bache Delaware's execution of those orders ... does not cure any prior fraud in Bache Lebanon's solicitation from the Tamaris, nor does it prevent the execution of the orders from being a necessary and foreseeable step in a scheme to defraud, and thus substantial conduct within the United States.

547 F.Supp. at 315. Hutton's conduct here was not only "substantial"; it also directly caused Psimenos' loss, thus satisfying *Bersch.*

---

*tries (Manitoba), Ltd. v. SEC,* 431 U.S. 938, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977) (same).

**7.** Bache Lebanon was a foreign corporation. Here, defendant is incorporated in the United

States. Since our holding is based on the conduct on United States trading markets, the nationality of those executing trades is immaterial.

Trading activities on United States commodities markets were significant acts without which Psimenos' losses could not have occurred, and are sufficient to establish jurisdiction. As the Ninth Circuit recently held in *Grunenthal GmBh v. Hotz*, 712 F.2d 421, 425 (9th Cir.1983), "to hold otherwise could make it convenient for foreign citizens and corporations to use this country ... to further fraudulent securities schemes."

Reversed and remanded.