**20-1648-cv**
*Choi v. Tower Rsch. Cap. LLC*


# In the
# United States Court of Appeals
## For the Second Circuit
————

AUGUST TERM, 2020

ARGUED: MAY 18, 2021
DECIDED: JUNE 22, 2021

No. 20-1648-cv

MYUN-UK CHOI, JIN-HO JUNG, SUNG-HUN JUNG, SUNG-HEE LEE, and
KYUNG-SUB LEE, individually and on behalf of all others similarly
situated,
*Plaintiffs-Appellants*,


*v.*


TOWER RESEARCH CAPITAL LLC, MARK GORTON,
*Defendants-Appellees*.[*]

————

Appeal from the United States District Court
for the Southern District of New York.

————


Before: WALKER, PARK, and NARDINI, *Circuit Judges*.


————

---

[*] The Clerk of Court is respectfully requested to amend the official
caption as set forth above.

Plaintiffs, five South Korean citizens, traded a derivative financial product called KOSPI 200 futures on an overnight market of the Korea Exchange (KRX). They brought this action against defendants Tower Research Capital LLC (Tower) and its CEO, Mark Gorton, alleging that, in 2012, Tower's trading of KOSPI 200 futures violated the anti-manipulation provisions of the Commodity Exchange Act (CEA). Following an initial appeal in which we rejected Tower's extraterritoriality defense, the district court (Kimba Wood, *J.*) entered summary judgment on plaintiffs' CEA claims, finding that Tower's overnight trading of KOSPI 200 futures was not "subject to the rules of [a] registered entity" as required by Section 9 of the CEA.

Plaintiffs appeal the judgment of the district court, arguing that: (1) there is a genuine factual dispute as to whether Tower's trading was subject to the rules of the Chicago Mercantile Exchange (CME), a "registered entity" under the CEA; (2) the district court abused its discretion by excluding the report of their expert; (3) the judgment contradicts our prior opinion denying Tower's extraterritoriality defense, and therefore violates the law of the case; and (4) the judgment will undermine public policy by placing trading of foreign futures in the United States beyond the reach of the CEA. For the reasons that follow, we find plaintiffs' contentions without merit and therefore AFFIRM the judgment of the district court.

_____

MICHAEL B. EISENKRAFT (Richard A. Speirs, Jessica (Ji Eun) Kim, *on the brief*), Cohen Milstein Sellers & Toll PLLC, New York, New York; Dan S. Sommers, *on the brief*, Cohen Milstein Sellers & Toll PLLC, Washington, District of Columbia; *for Plaintiffs-Appellants Myun-Uk Choi, et al.*

NOAH A. LEVINE, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York; Matthew T. Martens, Matthew Beville, Albinas J. Prizgintas, *on the brief*, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, District of Columbia; Adam Cambier, *on the brief*, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, Massachusetts; *for Defendants-Appellees Tower Research Capital LLC and Mark Gorton.*

————

JOHN M. WALKER, JR., *Circuit Judge*:

Plaintiffs, five South Korean citizens, traded a derivative financial product called KOSPI 200 futures on an overnight market of the Korea Exchange (KRX). They brought this action against defendants Tower Research Capital LLC (Tower) and its CEO, Mark Gorton, alleging that, in 2012, Tower's trading of KOSPI 200 futures violated the anti-manipulation provisions of the Commodity Exchange Act (CEA). Following an initial appeal in which we rejected Tower's extraterritoriality defense, the district court (Kimba Wood, *J.*) entered summary judgment on plaintiffs' CEA claims, finding that Tower's overnight trading of KOSPI 200 futures was not "subject to the rules of [a] registered entity" as required by Section 9 of the CEA.

Plaintiffs appeal the judgment of the district court, arguing that: (1) there is a genuine factual dispute as to whether Tower's trading was subject to the rules of the Chicago Mercantile Exchange (CME), a "registered entity" under the CEA; (2) the district court abused its discretion by excluding the report of their expert; (3) the judgment contradicts our prior opinion denying Tower's extraterritoriality defense, and therefore violates the law of the case; and (4) the judgment will undermine public policy by placing trading of foreign futures in the United States beyond the reach of the CEA.

For the reasons that follow, we find plaintiffs' contentions without merit and therefore AFFIRM the judgment of the district court.

## BACKGROUND

We draw our discussion of the facts from plaintiffs' second amended complaint[1] as well as exhibits and other evidence submitted in connection with defendants' motion for summary judgment. Unless otherwise noted, the facts are undisputed and construed in the light most favorable to plaintiffs.

The KOSPI 200 is an index of two hundred Korean stocks traded on the KRX, a securities and derivatives exchange headquartered in Busan, South Korea. To allow investors to take positions on future values of the KOSPI 200 index, the KRX created a derivative financial product called KOSPI 200 futures contracts.[2] During daytime hours, orders for KOSPI 200 futures are placed and matched on the KRX in South Korea. During overnight hours, orders for KOSPI 200 futures are placed on the KRX in South Korea but matched with a counterparty through an electronic platform called CME Globex in Aurora, Illinois.[3] Following matching, all trades—including those placed overnight—are settled on the KRX.

Unlike the KRX, CME Globex is not an exchange. Rather, it is an electronic platform that provides a trade-matching engine used by a number of exchanges—both foreign and domestic. Notably, CME Globex is owned by CME Group Inc. (CME Group), a holding

---

[1] *See* J. App. at 92–124 (second amended complaint, hereinafter referred to as "SAC").

[2] A futures contract is an agreement to purchase or sell a particular asset on a later date at a predetermined price. *See Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 69 n.3 (2d Cir. 2021).

[3] The KRX's overnight hours are 5:00 p.m. to 6:00 a.m. Seoul time, or 2:00 a.m. to 3:00 p.m. Chicago time.

company that also owns several domestic exchanges, including the CME, the Chicago Board of Trade (CBOT), the New York Mercantile Exchange (NYMEX), and the Commodity Exchange (COMEX). Like the KRX, all four of these exchanges use CME Globex to match trades of their own exchange's futures contracts.

In 2012, defendant Tower, a high-frequency trading firm in New York, executed nearly 4,000,000 trades for KOSPI 200 futures during the KRX's overnight hours—representing approximately 53.8% of all overnight KOSPI 200 futures trades for the entire calendar year. Plaintiffs, who also traded KOSPI 200 futures, allege that many of these trades were manipulative. Specifically, plaintiffs allege that Tower's traders placed large volume buy or sell orders on the KRX overnight market and then used Tower's algorithmic and high-speed trading technology to immediately cancel their orders or to fill their own orders before they could be matched by other traders. Tower employed these tactics because its intent was not to execute the trades with a counterparty, but rather to create a false impression of supply and demand and, in turn, artificially drive the market price up or down.[4] Plaintiffs allege that, once the market price moved in the desired direction, Tower sold futures contracts at the artificially inflated price or bought futures contracts at the artificially deflated price, earning more than $14,000,000 in illicit profits.

In May 2014, South Korean regulators announced that they had uncovered potentially unlawful trading in the overnight market for

---

[4] Plaintiffs describe aspects of Tower's scheme as a type of "spoofing." SAC ¶ 63. While the term "spoofing" has acquired various meanings over the years, *see United States v. Wedd*, 993 F.3d 104, 110 n.2 (2d Cir. 2021), in the context of commodities trading fraud it generally refers to the manipulative practice of "bidding or offering with the intent to cancel the bid or offer before execution," 7 U.S.C. § 6c(a)(5)(C) (defining "spoofing" under the Commodity Exchange Act).

KOSPI 200 futures and that they had referred Tower to South Korean prosecutors. Several months later, plaintiffs initiated the instant litigation, filing a class-action complaint on behalf of themselves and others who were allegedly harmed by Tower's manipulative scheme. The complaint asserted causes of action for violations of the CEA and New York common law.

In March 2015, defendants moved to dismiss the complaint on the basis that Tower's alleged conduct occurred in South Korea and so was not within the territorial reach of the CEA. The district court granted the motion in February 2016, holding that applying the CEA to Tower's conduct would be impermissibly extraterritorial under *Morrison v. National Australia Bank Ltd.*[5] The district court granted plaintiffs leave to amend their complaint, but later dismissed their amended complaint on the same basis in February 2017.[6] According to the district court, the amended complaint still failed to allege either that CME Globex was a domestic exchange or that Tower's trades were domestic transactions, at least one of which was required to establish domestic application under *Morrison*.[7]

In March 2018, we vacated the dismissal and remanded for

---

[5] *See Myun-Uk Choi v. Tower Rsch. Cap. LLC* (*Choi I*), 165 F. Supp. 3d 42, 48–50 (S.D.N.Y. 2016) (citing *Morrison*, 561 U.S. 247, 269–70 (2010)).

[6] *See Myun-Uk Choi v. Tower Rsch. Cap. LLC* (*Choi II*), 232 F. Supp. 3d 337, 340–43 (S.D.N.Y. 2017).

[7] *Id.* In *Morrison*, the Supreme Court concluded that Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), reaches "only transactions in securities listed on domestic exchanges" and "domestic transactions in other securities." 561 U.S. at 267. We held in *Loginovskaya v. Batratchenko* that *Morrison*'s "domestic transaction" test applies to the CEA, 764 F.3d 266, 272–75 (2d Cir. 2014), but we have not had occasion to decide whether *Morrison*'s "domestic exchange" test applies to the CEA as well.

further proceedings.[8]   Applying *Morrison* and more recent circuit precedent, we held that plaintiffs' allegations made it plausible that parties who trade KOSPI 200 futures on the KRX overnight market incur irrevocable liability in the United States, where their orders are matched through CME Globex.[9]   At the pleadings stage, those allegations were sufficient to show that Tower's trades were plausibly "domestic transactions" under *Morrison* such that applying the CEA to Tower's conduct would not constitute an extraterritorial application of the Act.[10]  Because our irrevocable liability analysis was a sufficient basis to resolve the extraterritoriality question, we declined to address whether the CEA could reach Tower's conduct on the basis that CME Globex is a "domestic exchange."[11]

In July 2018, following remand to the district court, defendants again moved to dismiss plaintiffs' CEA claims, this time raising a factual defense:  Even if the CEA could apply to Tower's trading without running afoul of *Morrison*, its trading of KOSPI 200 futures was not "subject to the rules of any registered entity" as required by the CEA itself.[12]  The district court referred the motion to a magistrate judge, who granted plaintiffs leave to amend their complaint in response to the motion.  In May 2019, plaintiffs filed a second amended complaint alleging that Tower's trading of KOSPI 200 futures was subject to the rules of the CME, one of four registered entities owned by CME Group.

After the close of fact discovery, defendants moved for judgment on the pleadings or, in the alternative, for summary judgment, maintaining that Tower's trading of KOSPI 200 futures was

---

[8] *See Myun-Uk Choi v. Tower Rsch. Cap. LLC* (*Choi III*), 890 F.3d 60, 63 (2d Cir. 2018).

[9] *Id.* at 66–68.

[10] *Id.*

[11] *Id.* at 66–67.

[12] *See* 7 U.S.C. § 9(1), (3).

not "subject to the rules of any registered entity."  In December 2019, the magistrate judge issued a report and recommendation concluding that the motion for summary judgment should be granted.[13]  On March 30, 2020, the district court adopted the recommendation in full and dismissed plaintiffs' CEA claims.[14]  On May 11, the district court entered final judgment on plaintiffs' CEA claims pursuant to Rule 54(b)[15] so that plaintiffs could file this appeal.[16]

## DISCUSSION

We review a decision granting summary judgment de novo,[17] mindful that summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[18]  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit under the governing law."[19]  In evaluating a motion for summary judgment, we resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.[20]

---

[13] *Myun-Uk Choi v. Tower Rsch. Cap. LLC* (*Choi IV*), No. 14 Civ. 9912, 2019 WL 6871295, at *4–9 (S.D.N.Y. Dec. 17, 2019), *report and recommendation adopted*, No. 14 Civ. 9912, 2020 WL 1503446 (S.D.N.Y. Mar. 30, 2020).

[14] *Myun-Uk Choi v. Tower Rsch. Cap. LLC* (*Choi V*), No. 14 Civ. 9912, 2020 WL 1503446, at *3–7 (S.D.N.Y. Mar. 30, 2020).

[15] *See* Fed. R. Civ. P. 54(b).

[16] *Myun-Uk Choi v. Tower Rsch. Cap. LLC* (*Choi VI*), No. 14 Civ. 9912, 2020 WL 2317363, at *1–2 (S.D.N.Y. May 11, 2020).  The district court did not enter judgment on plaintiffs' state-law claim for unjust enrichment. *Id.*  Only the CEA claims are at issue in this appeal.

[17] *Fischer v. Forrest*, 968 F.3d 216, 219 (2d Cir. 2020).

[18] Fed. R. Civ. P. 56(a).

[19] *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).

[20] *See Sloley v. VanBramer*, 945 F.3d 30, 36 (2d Cir. 2019).

Plaintiffs argue that the district court erred in granting summary judgment for four reasons.  First, they contend that there is a genuine factual dispute as to whether Tower's trading of KOPSI 200 futures was subject to the rules of the CME, a registered entity under the CEA.  Second, they contend that the district court abused its discretion by excluding the report of their expert, Professor Michael Greenberger.  Third, they contend that the district court's judgment contradicts our prior opinion denying Tower's extraterritoriality defense, and therefore violates the law of the case.  Fourth, they contend that the district court's ruling will undermine public policy by placing trading of foreign futures in the United States beyond the reach of the CEA. We disagree with each of plaintiffs' arguments, and therefore affirm.

## I.      The trading of KOSPI 200 futures on the KRX is not subject to the rules of the CME

The CEA makes it unlawful to manipulate or attempt to manipulate the price of any futures contract "on or subject to the rules of any registered entity."[21]  Neither the KRX nor CME Globex is a registered entity under the CEA,[22] so plaintiffs concede that KOSPI 200 futures are not traded "on" a registered entity—even when overnight orders are matched through CME Globex.  The sole issue, therefore, is whether overnight trading of KOSPI 200 futures is nonetheless "subject to" a registered entity's rules.

Plaintiffs claim that overnight trading of KOSPI 200 futures is subject to the rules of the CME, a domestic exchange registered under the CEA.  They contend that they identified sufficient evidence to survive summary judgment, and they argue that the district court erred by failing to draw all reasonable inferences in their favor.

---

[21] *See* 7 U.S.C. § 9(1), (3).

[22] The list of registered entities is defined by statute.  *See* 7 U.S.C. § 1a(40).

Reviewing the record de novo, we disagree. As both the magistrate judge and district court explained, at least two sources of evidence conclusively demonstrate that trading of KOSPI 200 futures is not subject to the rules of the CME.

First, the CME Rulebook[23]—the source of the CME's rules—specifies that it applies only to futures contracts that are created by and listed on the CME itself. It states that its rules apply to the trading and clearing of "*Exchange* futures,"[24] and it defines "Exchange" exclusively as the "Chicago Mercantile Exchange Inc.," or the CME.[25] It is undisputed that KOSPI 200 futures are not CME futures; they are KRX futures created by and listed on the KRX. If there were any doubt, the CME Rulebook explicitly lists hundreds of CME futures contracts that are subject to its rules.[26] Nothing on that list mentions KOSPI 200 futures—let alone the KRX. Thus, the Rulebook itself is virtually conclusive evidence that the trading of KOSPI 200 futures is not "subject to" the rules of the CME.

Second, both the CME and its parent, CME Group, have confirmed that the CME does not regulate the trading of KOSPI 200 futures, even when trades are matched using CME Globex. In response to a subpoena early in this case, the CME and CME Group stated that the "CME does not regulate, review, or monitor the trading activity that occurs in the KOSPI Futures contract[s]," as "such

---

[23] The parties principally cite Chapter 5 of the Rulebook and its governing definitions. *See* J. App. at 1095–149 (Chapter 5); *id.* at 495–506 (governing definitions). The full CME Rulebook is available online. *See CME Rulebook*, http://www.cmegroup.com/rulebook/CME.

[24] J. App. at 505 (emphasis added).

[25] *Id.* at 499.

[26] As reflected in the Table of Contents, the CME Rulebook devotes separate chapters to each futures contract. *See id.* at 245–51. Chapter 52, for example, lists "Class III Milk Futures" and specifies that such futures "shall be subject to the general rules and regulations of the Exchange." *Id.* at 253.

activity is done by the Korea Exchange."[27] CME Group later verified this in an unrebutted declaration.[28] The declaration explains that, while the CME and the KRX have a trade-matching services agreement under which KOSPI 200 futures are hosted on CME Globex for overnight trading, KOSPI 200 futures are "not listed on [the CME] and the trading itself remains governed by *the KRX rulebook*."[29] The declaration explicitly states that the "KRX bears *all* responsibility and must perform *all* regulatory obligations with respect to any [KRX] contracts traded on CME Globex," and it affirms that the "CME does not now, and has not ever, provided any of these regulatory functions" for such trading.[30] Thus, the CME itself has confirmed what its Rulebook already says: any trading of KOSPI 200 futures is regulated by the KRX, not the CME.

While plaintiffs acknowledge that KOSPI 200 futures are subject to the rules of the KRX, they dispute that KRX regulation is exclusive. They argue that Chapter 5 of the CME Rulebook, which concerns orders matched through CME Globex, speaks in broad terms and says nothing that would specifically exclude KOSPI 200 futures from its scope. Setting aside the declaration and the CME Rulebook's own restrictive statement on the scope of its rules, plaintiffs contend that the CME's silence with respect to KOSPI 200 futures creates "negative space" that, when combined with a smattering of other evidence, permits an inference that the CME in fact regulates overnight trading of KOSPI 200 futures alongside the KRX. This argument is without merit.

---

[27] *Id.* at 553.

[28] *See id.* at 558–60 (declaration of Robert Sniegowski, CME Group Executive Director, Rules and Regulatory Outreach).

[29] *Id.* at 559 (emphasis added).

[30] *Id.* at 560 (emphasis added).

As a threshold matter, the CEA requires exchanges to "establish, monitor, and enforce" their rules *affirmatively*, including by setting forth "the terms and conditions of any contracts to be traded" on the exchange.[31] Pursuant to this requirement, the CME explicitly lists each futures contract that it regulates, and its sister exchanges have done the same: the CBOT rulebook lists CBOT futures; the NYMEX rulebook lists NYMEX futures; and the COMEX rulebook lists COMEX futures. None of the products listed in the rulebooks of these four exchanges overlaps, even though all four exchanges rely on the services of CME Globex for overnight order-matching. This evidence strongly supports Tower's argument that, absent an affirmative statement to the contrary, trading in a futures contract is confined to, and regulated by, the exchange that creates it.[32]

Moreover, linking KOSPI 200 futures to Chapter 5 of the CME Rulebook—which plaintiffs claim governs *all* trading through CME Globex—would yield absurd results. As plaintiffs concede, all of the CME's sister exchanges have established analogous rules governing trading of *their own* futures contracts through CME Globex. Even the KRX has its own rules that apply when KRX futures are matched through the platform.[33] Plaintiffs' theory would require us to conclude that *any* futures contract matched on CME Globex is regulated by *every* exchange with rules governing the use of the

---

[31] 7 U.S.C. § 7(d)(2)(A)(ii).

[32] *See Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1047 (2d Cir. 1983) (explaining that a futures contract "has no lawful existence or being independent of the designated contract market upon which it is traded" (citation omitted)).

[33] The KRX has confirmed that its own rulebook applies to overnight trading of KOSPI 200 futures, and an entire chapter in Part 3 of the KRX Rulebook specifically governs the trading of KRX futures contracts through CME Globex. *See* J. App. at 322–25 ("Chapter III: Special Case of Trade on CME Globex").

platform. A CBOT trade would not only be subject to the rules of the CBOT, but also to the rules of the CME, the NYMEX, the COMEX, and perhaps even the KRX.[34] Unsurprisingly, CME Group itself says that is not how it works. As it explains in its declaration, each of the four exchanges offers "a different (and not overlapping) suite of products" and "[d]ifferent rulebooks govern trading depending on which [exchange] a product is listed on."[35]

Even if plaintiffs could present a coherent theory, the fragments of evidence they cite would not support a reasonable inference that overnight trades of KOSPI 200 futures are subject to the rules of the CME. Although plaintiffs place great stock in a handful of rules in Chapter 5 of the CME Rulebook, none of those rules contains any affirmative indication that the CME intended them to apply to the trading of KOSPI 200 futures on the KRX.[36] To the contrary, the rules cross-reference the same definitions that restrict their scope to *CME* futures traded on *CME Group* markets. Plaintiffs' reliance on comments in the CME Globex Reference Guide[37] fares no better. The CME Globex is not a registered entity, so the Guide does not reflect a registered entity's rules. Indeed, the Guide specifically instructs readers to "refer to the CME, CBOT or NYMEX Rulebooks" for "the text of actual rules or interpretations."[38]

Plaintiffs also attempt to peg KOSPI 200 futures to the CME's rules through several other documents, none of which supports their

---

[34] As plaintiffs concede in their reply brief, they could just as well argue that KOSPI 200 futures are subject to the rules of the CBOT, the NYMEX, or the COMEX. *See* Appellants' Reply Br. at 8 n.6.

[35] J. App. at 559.

[36] *See id.* at 1136 (Rule 574); *id.* at 1137–39 (Rule 578); *id.* at 1139 (Rule 579); *id.* at 1140 (Rule 580); *id.* (Rule 583.A); *id.* at 1143 (Rule 588.H).

[37] *See id.* at 1833–61.

[38] *Id.* at 1854.

case. They first point to two documents—a 1989 memorandum[39] and a 2008 "no action" letter[40]—published by the Commodity Futures Trading Commission (CFTC). But, as the district court explained, neither of those documents purports to address a foreign exchange's use of CME Globex for overnight order-matching—particularly where, as here, the futures are offered and sold exclusively on a foreign exchange.[41] Plaintiffs next point to a 2012 email[42] from CME Group warning that Tower was "consuming KRX market data without the appropriate licensing" and that CME Group would "continue to monitor for non-compliance."[43] But CME Group is not a registered entity under Section 9 and, even if it were, the district court correctly observed that the email concerns CME Group's capacity as a vendor for KRX market data—not as a regulator of KRX futures trading.[44]

Unable to identify any affirmative evidence that the CME's rules apply, plaintiffs turn the tables and argue that Tower has failed to prove the negative. They cite a handful of cases in which courts have applied the CEA to trades that were matched through CME Globex. But when confronted with the fact that all of those cases

---

[39] *See id.* at 922–1079.

[40] *See id.* at 488–94.

[41] *Choi V*, 2020 WL 1503446, at *5. The 1989 memorandum considered rules that "relate solely to CME contracts" and expressly noted that "[i]ssues relating to foreign exchanges are not currently before the Commission." J. App. at 929, 1075. The 2008 "no action" letter says nothing about the trading of KOSPI 200 futures on the KRX. Rather, it confirms that *U.S. brokers*—who are not at issue in this case—may "offer [or] s[ell]" KOSPI 200 futures to their U.S. customers provided that the brokers remain governed by certain CFTC regulations. *Id.* at 494.

[42] *See* J. App. at 2034–35.

[43] *Id.* at 2034–35.

[44] *See Choi V*, 2020 WL 1503446, at *6.

involved products traded on the CME or another registered entity,[45] plaintiffs pivot, arguing that "no court has ever held" that a futures contract matched through CME Globex "is *not* covered by the CEA."[46] Plaintiffs take the same tack with the CME Group declaration. Although they acknowledge that the declaration "says that the KRX Rulebook applies exclusively to KOSPI 200 futures trading," they assert that "it conspicuously fails to say that the CME Rulebook does *not* apply to KOSPI 200 futures trading on the CME Globex."[47] In both cases, the negative inferences that plaintiffs ask us to draw are nearly fantastical. They fail to create a genuine issue for trial.

## II. The district court did not abuse its discretion by excluding Professor Greenberger's expert report

In addition to relying on the evidence discussed above, plaintiffs argue that the district court erred by declining to consider as evidence the written report of their expert witness, Professor Greenberger, who opined that Tower's trading of KOSPI 200 futures was "subject to" the rules of the CME.[48] The district court made no such error.

---

[45] *See CFTC v. Oystacher*, No. 15 Civ. 9196, 2016 WL 3693429, at \*3-4, \*8 (N.D. Ill. July 12, 2016) (COMEX, NYMEX, CME, and Chicago Board Option Exchange Futures Exchange futures contracts); *Laydon v. Mizuho Bank, Ltd.*, No. 12 Civ. 3419, 2014 WL 1280464, at \*2 (S.D.N.Y. Mar. 28, 2014) (CME futures contracts); *CFTC v. Taylor*, No. 12 Civ. 8170, 2013 WL 5437362, at \*2 (S.D.N.Y. Aug. 29, 2013) (CME futures contracts); *In re Rough Rice Commodity Litig.*, No. 11 Civ. 618, 2012 WL 473091, at \*1 (N.D. Ill. Feb. 9, 2012) (CBOT futures contracts); *CFTC v. Garofalo*, No. 10 Civ. 2417, 2010 WL 11245430, at \*1 (N.D. Ill. Dec. 21, 2010) (CME futures contracts).

[46] Appellants' Br. at 44 (emphasis added).

[47] *Id.* at 33.

[48] J. App. at 666; *see generally id.* at 660–72.

It is well established that expert testimony admitted under Rule 702 must be relevant,[49] meaning it must "help the trier of fact to understand the evidence or to determine a fact in issue."[50] Expert testimony that usurps the role of the factfinder or that serves principally to advance legal arguments should be excluded.[51] The proponent of expert testimony carries the burden of establishing its admissibility by a preponderance of the evidence,[52] and we review a trial judge's exclusion of expert testimony for abuse of discretion.[53]

Here, Professor Greenberger's report functions as little more than a legal brief that parrots plaintiffs' arguments. The report identifies a handful of rules in Chapter 5 of the CME Rulebook (the same rules that plaintiffs marshal in their briefing), and it cites several cases and CFTC documents that Professor Greenberger claims supports his interpretation of those rules (the same cases and CFTC documents that plaintiffs cite). Much of Professor Greenberger's report advances policy arguments. As the district court explained, the report "offers scant input" on the issues appealed and, in any event, would not alter the outcome on summary judgment.[54] The district court did not abuse its discretion by excluding it.

## III. The district court's judgment does not contradict our prior ruling in this case

Despite their failure to show that KOSPI 200 futures are subject to the rules of the CME, plaintiffs argue that we should reverse the district court because its judgment contradicts our prior decision,

---

[49] *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

[50] Fed. R. Evid. 702.

[51] See *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999); *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992).

[52] *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

[53] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142–43 (1997).

[54] *Choi V*, 2020 WL 1503446, at *7.

which is now law of the case.  As explained above, our prior opinion found it plausible that parties trading KOSPI 200 futures on the overnight market of the KRX incurred irrevocable liability in the United States, where the orders were matched through CME Globex. Although the opinion focused exclusively on Tower's extraterritoriality defense under *Morrison*, plaintiffs contend that the district court's entry of summary judgment "effectively overrules" that decision by holding that the CEA does not, in fact, cover the trading at issue.[55]

The law of the case doctrine "forecloses reconsideration of issues that were decided—or that could have been decided—during prior proceedings."[56]  It applies "both to that which is expressly decided as well as to everything decided by necessary implication."[57] While the doctrine "does not rigidly bind [us] to [our] former decisions,"[58] we generally adhere to prior decisions in subsequent stages of the same case "unless 'cogent and compelling reasons militate otherwise.'"[59]  Cogent and compelling reasons justifying a departure from the law of the case may include "an intervening change in law, availability of new evidence, or 'the need to correct a clear error or prevent manifest injustice.'"[60]

The district court's judgment does not violate the law of the case.  As we noted above, our prior opinion addressed only whether

---

[55] Appellants' Br. at 19.

[56] *Doe v. E. Lyme Bd. of Educ.*, 962 F.3d 649, 662 (2d Cir. 2020) (quoting *United States v. Williams*, 475 F.3d 468, 471 (2d Cir. 2007)).

[57] *United States v. Yonkers Bd. of Educ.*, 856 F.2d 7, 11 (2d Cir. 1988) (internal quotation marks, citation, and alteration omitted).

[58] *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (quoting *Higgins v. Cal. Prune & Apricot Grower, Inc.*, 3 F.2d 896, 898 (2d Cir. 1924)).

[59] *Id.* (quoting *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002)).

[60] *Id.* at 99–100 (quoting *Quintieri*, 306 F.3d at 1230).

application of the CEA to Tower's alleged conduct would constitute an extraterritorial application of the Act in violation of *Morrison*.[61] In concluding that it would not, our analysis focused exclusively on *Morrison*'s "domestic transactions" test and declined to address whether the CEA might plausibly have territorial reach over plaintiffs' allegations on the basis that CME Globex is a "domestic exchange."[62] In any event, our conclusion that *Morrison* does not prevent the CEA from regulating these transactions says nothing about whether a registered entity affirmatively subjected Tower's trading to its rules. Our prior opinion did not address the requirement in Section 9 that trading be "subject to the rules of [a] registered entity," and it did not resolve whether the trading of KOSPI 200 futures through CME Globex was in fact governed by the CME Rulebook.

## IV. The district court properly rejected plaintiffs' public policy arguments

Ultimately, plaintiffs fall back on public policy. They remind us that the CEA was designed as a remedial statute, and that it serves an important role in protecting retail investors and promoting the integrity of futures markets.[63] They argue that, if the district court's decision stands, it will create a "gigantic loophole" in which plausibly domestic transactions evade enforcement under the CEA simply

---

[61] *Choi III*, 890 F.3d at 66.

[62] *Id.* at 66–67.

[63] *See Loginovskaya*, 764 F.3d at 270 (explaining that "[t]he CEA . . . serves the crucial purpose of protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived" (internal quotation marks and citation omitted)).

because they are not "subject to the rules of [a] registered entity."[64] Plaintiffs' arguments are unpersuasive.

First, as the district court recognized, it is the CEA itself that restricts its scope to futures contracts "on or subject to the rules of [a] registered entity."[65] Our task is to "give the statute the effect its language suggests, . . . not to extend it to admirable purposes it might be used to achieve."[66] Thus, while it might further certain of plaintiffs' policy interests for Congress to have legislated more expansively, it did not do so, and it is not our place to effectively strike Section 9's requirement from the text of the law.[67]

Second, plaintiffs' policy arguments are overstated in any event. As plaintiffs concede, the trading of KOSPI 200 futures on the KRX will remain subject to the rules of the KRX, including when they are matched using CME Globex. The KRX prohibits manipulative trading, and it enforces its rules through a Market Oversight Commission that "conducts market surveillance . . . to prevent unfair trading practices such as manipulation."[68] Indeed, plaintiffs initiated this case only after South Korean regulatory authorities identified irregularities in Tower's trading and referred Tower to South Korean prosecutors. Plaintiffs do not suggest that the absence of concurrent U.S. regulation leaves them unprotected from the wrongdoing of would-be manipulators.

---

[64] *See* Appellants' Br. at 51–54; *see also* 7 U.S.C. § 9(1), (3).

[65] *See* 7 U.S.C. § 9(1), (3).

[66] *Morrison*, 561 U.S. at 270.

[67] *See Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 108 (2d Cir. 2019) ("'[T]he sole function of the courts is to enforce [the CEA] according to its terms,' not to reinvent it." (second alteration in original) (quoting *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006))).

[68] *See* J. App at 488.

Finally, while it appears that the trading of foreign futures on a foreign exchange will rarely be subject to the rules of a registered entity, our decision today is a principally a factual one.  Nothing in our opinion is intended to interfere with existing authorities under the CEA or other federal statutes that may allow domestic exchanges to regulate foreign futures, in particular when such futures are offered and sold in the United States.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.